IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,     No. 4:22-CR-00319-LPR
v.
                                   Monday, February 9, 2026
BRUCE McARTHUR SMITH, aka          Little Rock, Arkansas
"ROCK," KEVIN LANGEL, aka          8:44 a.m.
"CALVIN," and LARRY ROGERS,

                    Defendants.


**TRANSCRIPT OF JURY TRIAL - VOLUME 5 OF 5**
BEFORE THE HONORABLE LEE P. RUDOFSKY,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

On Behalf of the Plaintiff:

     MR. CHRIS GIVENS, Assistant United States Attorney
     MS. AMANDA FIELDS, Assistant United States Attorney
         United States Attorney's Office
         Eastern District of Arkansas
         Post Office Box 1229
         Little Rock, Arkansas 72203-1229


On Behalf of the Defendant Smith:

     MR. ROBERT M. GOLDEN, Attorney At Law
         The Law Office of Robby Golden
         3700 Cantrell Road, Suite 102
         Little Rock, Arkansas 72202
     Defendant Smith present;


                              (Appearances continued.)


          Proceedings reported by machine stenography.
     Transcript prepared utilizing computer-aided transcription.


Lorie E. Kennedy, RMR, CRR, CRC, United States Court Reporter
lorie_kennedy@ared.uscourts.gov (501)604-5165

APPEARANCES: (Continued)

On Behalf of the Defendant Langel:

    MR. SYLVESTER SMITH, III, Attorney At Law
        The Firm, PLLC
        4137 JFK Boulevard, Suite D
        North Little Rock, Arkansas 72116
    Defendant Langel present;


On Behalf of the Defendant Rogers:

    MR. CHRISTOPH A. TARVER, Assistant Federal Defender
        Federal Public Defender's Office
        1401 West Capitol Avenue, Suite 490
        Little Rock, Arkansas 72201
    Defendant Rogers present.

INDEX

Court's Closing Instructions-------------------------- 1044

Closing Arguments
    By Ms. Fields ----------------------------------- 1062
    By Mr. Golden ----------------------------------- 1100
    By Mr. Tarver ----------------------------------- 1112
    By Mr. Smith ------------------------------------ 1118
    By Mr. Givens ----------------------------------- 1138

Court's Final Instruction --------------------------- 1164

Jury's Verdicts ------------------------------------- 1181

Jury Polled ----------------------------------------- 1183

Lorie E. Kennedy, RMR, CRR, CRC, United States Court Reporter
lorie_kennedy@ared.uscourts.gov (501)604-5165

PROCEEDINGS

(Proceedings commencing in open court at 8:44 a.m.)

THE COURT:  Okay.  It looks like we're all here.

4:22-CR-00319, United States of America against Smith, et al., Day 92.  I guess, Day 6 in reality.

Couple of things:  First, we closed evidence last time around, and I did not ask for motions.  I think just to be fair to everybody, I should ask if anybody has a motion for me.

Mr. Golden?

MR. GOLDEN:  Your Honor, I would renew my motion for judgment of acquittal.  I would ask the Court to consider the exact arguments that I made word for word, incorporate them into this renewal.  We had two additional witnesses.  I do not think they have affected my argument or the proof in my case, so I am asking the Court to reconsider my motion for acquittal.

THE COURT:  I'm going to deny it, or whatever the right words are, stick with my original ruling, whatever you want to call it for the same reasons that I explained before or, really, that the Government explained and I adopted.

Having said that, Mr. Givens, if you want to say anything else on that matter, you're more than welcome to.

MR. GIVENS:  No, Your Honor.  I would respond with the same arguments that I responded at the close of our case.

THE COURT:  Okay.  Very well.

Mr. Tarver?

MR. TARVER:  Your Honor, on behalf of Mr. Rogers and our Rule 29 motion for judgment of acquittal, I would renew the arguments that I made previously and ask the Court to find that the Government has not met its burden and not provided enough evidence for this case to go to the jury.

THE COURT:  I have the same decision as last time, so I will deny it, or for the same reasons as last time.  And, again, whether it's characterized as a denial or a decision not to reconsider, essentially same deal in substance.

Mr. Givens, on that one, do you want to say anything for the record?

MR. GIVENS:  Your Honor, I would respond with the same arguments I made at the close of our case in chief.

THE COURT:  Okay.  Very well.

Mr. Smith?

MR. SMITH:  Yes, Your Honor.  We would renew our motion for judgment of acquittal pursuant to Rule 29 and adopt the arguments that we made before with the addition of the fact that we did provide evidence that helped to rebut some of the assertions the Government made in their case in chief.  So for that reason, Judge, we would renew our motion for judgment of acquittal.

THE COURT:  I will say for the same reasons as I explained before, which, again, essentially were adoption of the Government's reasons, I'm going to deny that motion.

I acknowledge, Mr. Smith, that you've sort of added to that in terms of the two witnesses that testified. I don't think either of their testimony was strong enough on any particular issue to somehow take this away from the jury.

Having said that, Mr. Givens, I'm happy to listen to you if you want to be heard for the record.

MR. GIVENS: Your Honor, regarding Mr. Langel, I would renew the same arguments I made at the close of our case in chief and add that, although witnesses provided alternate explanations to the Government's evidence, at this stage, we're still viewed in the light most favorable to the Government, and there is ample proof that those WhatsApp messages that Ms. Langel attempted to discredit were in fact evidence of drug dealing, so we submit there is enough evidence to go to the jury.

THE COURT: I agree with that.

Next, in terms of closing instructions, I'm very hopeful you all had a chance to review carefully the packet we provided to you. Does anybody have anything they'd like to raise with me?

Mr. Givens?

MR. GIVENS: I have reviewed it, and there are no objections from the United States.

THE COURT: Obviously, you keep all your substantive objections, but your point is you think what we were supposed to

write in here in terms of what I decided is actually what we did write in?

MR. GIVENS:  That's what I mean.  Yes, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  I agree, Your Honor.  I think we still have the outstanding, you know, Defendants not testifying to correct.  That wasn't in our packet.

THE COURT:  That's a -- what instruction is that in? I cannot, on my copy, tell you what that is.

MR. GOLDEN:  Give me a second, Your Honor.

THE COURT:  I think it's Instruction No. 4, Page 49. And just so you all know, the way that reads in my version now is, "The fact that the Defendants did not testify must not be considered by you in any way or even discussed in arriving at your verdicts.  That is because there is no burden upon the Defendants to prove that they are innocent.  The burden of proof remains on the Government throughout the entire trial."

MR. GOLDEN:  That's good for me, Your Honor.

THE COURT:  Anything else other than that?

MR. GOLDEN:  There was not.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  Very well.  Let me ask my brain

trust over here for one second if I have anything or he would like me to raise anything with you because he's the one who actually put pen to paper finishing up the instructions.  Hold on.

I do want to ask you all about the form in which these are going to go back.  So, No. 1, you should know that my plan is to send four copies of the instructions back.  Several juries, when I talk to them at the end of trial, have noted that they really don't like just getting one version of the instructions because then they have to sort of waste time each passing them around to read them.  So if they get three or four copies of them, it helps them look through it, so that's my plan.  It will only be one verdict -- you know, one packet of verdict forms, but four copies of the instructions, or at least three.

I also intend to include the preliminary instructions, a few of the during-court instructions, and I will tell you which ones, the 404(b) instruction, the statement by the Defendant instruction, and I think that's it.  Those two, I intend to include those and then the closing instructions.  Anybody have any problem with that?

Mr. Givens?

MR. GIVENS:  I don't, Your Honor.  I don't know -- I can't recall a time sending anything other than closing instructions back to the jury, but if that is --

THE COURT:  I mean, I usually only send preliminary

instructions and closing instructions.  The reason I'm sending the other ones back, honestly, is because I think they're more detailed than they usually are, and so I think it will be helpful for the jury to have them.

MR. GIVENS:  That's fine, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No objection, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No objection.

THE COURT:  Mr. Smith?

MR. SMITH:  No objection, Your Honor.

THE COURT:  Okay.  I think I understand from Heather that you all have agreed on the exhibits.  Is that correct, Mr. Givens?  Meaning, the exhibits to go back, you've signed off on them?

MR. GIVENS:  I believe so.  They have been reviewed. I don't know if I got an answer from everybody, but I think that we're all in agreement, Your Honor, yes.

THE COURT:  Mr. Golden?

MR. GOLDEN:  They look good to me, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  They were fine.

THE COURT:  Mr. Smith?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Okay.  Anybody think of anything else we

need to do before we call the jury back in and I give them instructions and then we start with closing arguments?

Mr. Givens?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  Your Honor, I hate to do this.  I don't know if the Court got word, but I have logistical hurdles today, if I could get three minutes to go to the restroom, Judge.

THE COURT:  You can.  That's fine.  And, actually, I'm glad you stood up, Mr. Smith.  It reminded me of one thing.

I do want to make the record clear because I know for the whole trial, there's sort of every -- maybe every day or so we've started to have a little bit of this conversation, which is the conversation about, you know, how much you're going to say or not say with respect to the Bruton issue.  And I just want to make clear where I believe we have always left it and have left it so far, which is I have not made any kind of ruling on that issue.  I have not told you you can do something, you can't do something.  I haven't said anything one way or the other.

I think the way I understood it is that you and Mr. Givens

were going to see if you could sort of, you know, agree with each other on what to do, and if that's true and you sort of -- you're going to voluntarily do what would make Mr. Givens happy or at least what he can live with, then I have no need to decide anything.  Is that where we are or is there something that needs my decision?

MR. SMITH:  I think we're okay, Judge, but -- I think we're okay.  My main -- I think Mr. Givens's main concern is that I don't get up there and say that there is no way they were doing a drug deal at this taco stand.  And I don't intend to go there.

THE COURT:  I guess here is my point:  I am not going to decide something.  I am not going to say, yes, you can, no, you can't.  I am not going to limit you in any way unless there is a live issue.  It strikes me from what I've heard, there is not a live issue, but I don't know.

My only point is, I haven't ruled one way or the other, and I think what you and Mr. Givens were doing were trying to get together so you can avoid an objection at the time of closing. It strikes me that what you're all telling me is you're satisfied and I don't have to worry about this, but I want to make sure I'm right about that.

Mr. Smith, is that what you think from your end?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Mr. Givens, is that what you think from

your end?

MR. GIVENS:  It is, Your Honor.  And I'm -- I am recalling the conversation that the three of us had on Friday before we broke about what he, Mr. Smith, intended to do.  And I had no problem with that.  He is right.  My only contention is do not suggest that the only thing that they did was get tacos.

THE COURT:  I hear you.

MR. GIVENS:  And I'm not -- I don't think that you need to decide anything.  I believe that Mr. Smith, based on representations, is going to be fine on this point, so I will not have a problem with it.  If I feel it was egregious that required the Court's intervention, I will let you know.  But I do not anticipate that happening.

THE COURT:  All I want to do is make clear, I haven't ruled on anything at all at this point, and if I don't have to, I would rather not.  But if I have to, I will at some point.

Okay.  Very well.  Mr. Smith, you can take five minutes, if you need to, and then we will call the jury in.

THE COURTROOM DEPUTY:  We're missing a juror.

THE COURT:  We're missing a juror, okay.  We're in recess for now.

(A short break was taken from 8:55 a.m. to 9:05 a.m.)

THE COURT:  Okay.  I think I see that everybody is back.  Heather, do you know if our juror has appeared yet?

THE COURTROOM DEPUTY:  I know they were walking -- he

was walking in.

THE COURT:  While Heather is doing that, just so everybody knows, I break between the 12th and the 13th instruction for closing arguments; meaning, between the penultimate instruction and the ultimate instruction, I give the last instruction after you are all done with closing arguments. Having said that, of course you all are more than welcome to use the verdict forms that are associated with my final instructions.  Just because I haven't said them in closing doesn't mean you don't get to use them.

THE COURTROOM DEPUTY:  They're walking down.

THE COURT:  Everybody up.  We're ready whenever you are.

THE COURT SECURITY OFFICER:  Ladies and gentlemen, the jury.

(Jury enters.)

THE COURT:  Everybody be seated, please.

Members of the jury, I hope you had a nice weekend. Anybody learn anything about the case over the weekend?  If so, please raise your hand.  I see no hands.

Anybody talk to anybody else about the case or had someone talk to them about the case?  If so, please raise your hand.  I see no hands.

I am about to give you some lengthy instructions and then we will have closing arguments.

Members of the jury, the instructions I gave you at the beginning of trial and during trial remain in effect.  I will now give you some additional instructions.  You must, of course, continue to follow the instructions I gave you earlier as well as those I give you now.  You must not single out some instructions and ignore others because all are important.  This is true even though some of the instructions I gave you at the beginning of trial and during the trial are not repeated here.

The instructions I'm about to give you now as well as many of those I gave you earlier are in writing and will be available to you in the jury room.  I emphasize, however, that this does not mean that they are more important than any other instructions I have given you.  Again, all instructions, whenever given and whether in writing or not must be followed.

It is your duty to find from the evidence what the facts are.  You will then apply the law as I give it to you to those facts.  You must follow my instructions on the law, even if you thought the law was different or should be different.  You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, prejudices, sympathy, or biases, including unconscious bias.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may express without conscious awareness, control, or intention.  Like conscious bias, unconscious bias, too, can affect how we

evaluate information and make decisions.  The law demands of you just verdicts unaffected by anything except the evidence, your common sense, and the law as I give it to you.

I have mentioned the word "evidence."  The evidence in this case consists of the testimony of witnesses, the documents, and other things received as exhibits, and the facts that have been stipulated; that is, formally agreed to by the parties.  As an aside, I don't believe there have been any stipulations in this case, but it's not my memory that's important.  It's your memory.

You may use reason and common sense to draw deductions or conclusions from facts that have been established by the evidence in this case.  Certain things, however, are not evidence.  I shall list those things again for you now.

One:  Statements, arguments, questions, and comments by lawyers representing the parties in the case are not evidence.

Two:  Objections are not evidence.  Lawyers have a right to object when they believe something is legally improper.  You should not be influenced by the objection.  If I sustained an objection to a question, you must ignore the question and must not try to guess what the answer might have been.

Three:  Testimony that I struck from the record or told you to disregard is not evidence and must not be considered.

Four:  Anything you saw or heard about this case outside the courtroom is not evidence.

Five:  The indictment is not evidence.  As I instructed you earlier, it is simply a document that formally charges Mr. Bruce Smith, Mr. Langel, and Mr. Rogers with the crime for which each of them is on trial.  Mr. Bruce Smith, Mr. Langel, and Mr. Rogers have pleaded not guilty to the indictment, and you are here to determine whether or not the Government has proved beyond a reasonable doubt that Mr. Bruce Smith, Mr. Langel, or Mr. Rogers is guilty of the crime with which each is charged.

Two other points on evidence are worth noting here.  First, if you were instructed that some evidence was received for a limited purpose only, you must follow that instruction.  Second, some of you may have heard of the terms "direct evidence" and "circumstantial evidence."  You are instructed that you should not be concerned with those terms.  The law makes no distinction between direct and circumstantial evidence.  You should give all the evidence the weight and value you believe it is entitled to receive.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness said or only part of it or none of it.  In deciding what testimony to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness

said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

In deciding whether or not to believe a witness, keep in mind that people sometimes hear or see things differently and sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent mis-recollection or lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or only a small detail.

I want to note something more specifically about Sergeant Briggs's testimony. Persons who by knowledge, skill, training, education, or experience have become expert in some field may state their opinions on matters in that field and may also state the reasons for their opinion. Expert testimony should be considered just like any other testimony. You may accept or reject it and give it as much weight as you think it deserves considering the witness's education and experience, the soundness of the reasons given for the opinion, the acceptability of the methods used, and all the other evidence in the case.

The fact that the Defendants did not testify must not be considered by you in any way or even discussed in arriving at your verdicts; that is because there is no burden upon the Defendants to prove that they are innocent. The burden of proof

remains on the Government throughout the entire trial.

In addition to the general instruction on witness testimony that you just heard, I need to give you a more specific instruction with respect to Roderick Lamont Toney and Arnold Turner.  You have heard evidence that Mr. Toney and Mr. Turner have made plea agreements with the Government.  Mr. Toney and Mr. Turner have pleaded guilty to the conspiracy here charged against Mr. Bruce Smith and each of them hope to receive a reduced sentence in return for their cooperation with the Government in this case.

Specifically you have heard that Mr. Toney entered into an agreement with the Government under which, in return for a guilty plea to the conspiracy charge and for the promise of cooperation with the Government, the Government dismissed the following charges against Mr. Toney:  Conspiracy to possess fentanyl with the intent to distribute, possession of fentanyl with the intent to distribute, conspiracy to possess cocaine with the intent to distribute, distribution of at least 50 grams but less than 500 grams of methamphetamine, and possession of a firearm in furtherance of a drug trafficking crime.

And you have heard that Mr. Turner entered into an agreement with the Government under which, in return for a guilty plea to the conspiracy charge and for the promise of cooperation with the Government, the Government dismissed the following charges against Mr. Turner:  Use of a communication

device, a telephone, in committing, causing, and facilitating a conspiracy to distribute a controlled substance.

For the conduct Mr. Toney and Mr. Turner pleaded guilty to, Mr. Toney and Mr. Turner are subject to a mandatory minimum sentence; that is a sentence that the law provides must be of a certain minimum length.  If the prosecutor handling the case believes that Mr. Toney or Mr. Turner provided substantial assistance in the case before us, that prosecutor can file a motion to reduce his sentence below the statutory minimum.

The judge has no power to reduce a sentence for substantial assistance unless the Government, acting through the prosecutor, files such a motion.  If such a motion for reduction of sentence for substantial assistance is filed by the Government, then it is up to the judge to decide whether to reduce the sentence at all and, if so, how much to reduce it.

Why am I pointing this out to you, you might ask.  It is because you have heard testimony from Mr. Toney and Mr. Turner stating that they participated in the conspiracies charged against the Defendants; that testimony was received in evidence and may be considered by you.  You may give that testimony such weight as you think it deserves.  Whether or not that testimony may have been influenced by their hope of receiving a reduced sentence or otherwise to strike a good bargain with the Government is for you to determine.

I also need to tell you that Mr. Toney's and Mr. Turner's

guilty pleas themselves cannot be considered by you in any way as evidence of Mr. Bruce Smith's, Mr. Rogers's, or Mr. Langel's guilt on the conspiracy charges against them in our case. Mr. Toney's and Mr. Turner's guilty pleas can be considered by you only for the purpose of determining how much, if at all, to rely upon Mr. Toney's and Mr. Turner's testimonies respectively.

At the beginning of this trial, you heard people, including me, use the term "beyond a reasonable doubt." I am now going to explain that term in more detail. Reasonable doubt is doubt based upon reason and common sense and not doubt based on speculation. A reasonable doubt may arise from careful and impartial consideration of all the evidence or from a lack of evidence. Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person, after careful consideration, would not hesitate to rely and act upon that proof in life's most important decisions. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a Defendant's guilt, but proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

As I instructed you at the beginning of trial, a Defendant is presumed innocent and begins the trial with a clean slate with no evidence against him; that presumption of innocence alone is sufficient to find the Defendant not guilty and is only overcome if the Government proved during the trial each element of the crime charged beyond a reasonable doubt. There is no

burden upon a Defendant to prove that he is innocent; instead, the burden of proof remains on the Government throughout the trial.

As you know, the Government has brought charges in this case against three different Defendants.  In the next set of instructions, I will lay out those charges for you and, for each charge, provide you the elements that the Government must prove beyond a reasonable doubt to obtain a conviction.  These instructions are known as the elements instructions.  After I finish with all the elements instructions, I will provide some additional instructions that are meant to help you work through your analysis of the elements of certain charges.

The Government has charged Bruce Smith with conspiracy to distribute a mixture or substance containing a detectable amount of methamphetamine; that alleged crime has three elements.

Element 1:  Sometime between January 2020 and August 2022, two or more persons reached an agreement or came to an understanding to distribute a mixture or substance containing a detectable amount of methamphetamine.

And Element 2:  Sometime between January 2020 and August 2022, Bruce Smith voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or while the agreement or understanding was still in effect.

And Element 3:  At the time Bruce Smith joined in the

agreement or understanding, he knew the purpose of the agreement or understanding.

If, and only if, the Government proved each of these elements beyond a reasonable doubt, you must find Bruce Smith guilty of the crime charged.  Otherwise, you must find Bruce Smith not guilty of the crime charged.

If you find Bruce Smith guilty of the crime charged, you will then have to resolve a further question related to the quantity of the mixture or substance containing a detectable amount of methamphetamine involved in the conspiracy.  In answering that question, the quantity involved in the agreement or understanding includes, one, the quantity that Bruce Smith distributed or agreed to distribute; and, two, the quantity that fellow conspirators distributed or agreed to distribute if you find that these distributions or agreements to distribute by fellow conspirators were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by Bruce Smith.

Next elements instruction.  The Government has charged Kevin Langel with conspiracy to distribute a mixture or substance containing a detectable amount of cocaine; that alleged crime has three elements.

Element 1:  Sometime between April 2022 and January 2023, two or more persons reached an agreement or came to an understanding to distribute a mixture or substance containing a

detectable amount of cocaine.

And Element 2:  Sometime between April 2022 and January 2023, Kevin Langel voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or while the agreement or understanding was still in effect.

And Element 3:  At the time Kevin Langel joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

If, and only if, the Government has proved each of these elements beyond a reasonable doubt, you must find Kevin Langel guilty of the crime charged.  Otherwise, you must find Kevin Langel not guilty of the crime charged.

If you find Kevin Langel guilty of the crime charged, you will then have to resolve a further question related to the quantity of the mixture or substance containing a detectable amount of cocaine involved in the conspiracy.  In answering that question, the quantity involved in the agreement or understanding includes, one, the quantity that Kevin Langel distributed or agreed to distribute; and, two, the quantity that fellow conspirators distributed or agreed to distribute if you find that these distributions or agreements to distribute by fellow conspirators were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by Kevin Langel.

Next elements instruction.  The Government has charged Larry Rogers with conspiracy to distribute a mixture or substance containing a detectable amount of cocaine; that alleged crime has three elements.

Element 1:  Sometime between April 2022 and January 2023, two or more persons reached an agreement or came to an understanding to distribute a mixture or substance containing a detectable amount of cocaine.

And Element 2:  Sometime between April 2022 and January 2023, Larry Rogers voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or while the agreement or understanding was still in effect.

And Element 3:  At the time Larry Rogers joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

If, and only if, the Government has proved each of these elements beyond a reasonable doubt, you must find Larry Rogers guilty of the crime charged.  Otherwise, you must find Larry Rogers not guilty of the crime charged.

If you find Larry Rogers guilty of the crime charged, you will then have to resolve a further question related to the quantity of the mixture or substance containing a detectable amount of cocaine involved in the conspiracy.  In answering that question, the quantity involved in the agreement or

understanding includes, one, the quantity that Larry Rogers distributed or agreed to distribute; and, two, the quantity that fellow conspirators distributed or agreed to distribute if you find that these distributions or agreements to distribute by fellow conspirators were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by Larry Rogers.  That's it for the elements instructions.

As I promised earlier, however, I'm now going to provide some instructions to help you analyze the elements instructions that I just gave you.

First, except to the extent I specifically tell you otherwise elsewhere in these instructions, intent and knowledge may be proved like anything else.  You may consider all the facts and circumstances in evidence which may aid in a determination of a person's intent or knowledge.  This includes, but is not limited to, consideration of statements made and acts done by the person in question.  Additionally, you may, but are not required to, infer that a person intends the natural and probable consequences of his knowing act, acts, or omissions.

Second, whenever two specific dates are used in the elements instructions to provide a timeframe for an alleged offense -- and, here, months count as specific dates -- the Government must prove that the alleged offense in question happened reasonably close to that timeframe, but it is not required to prove that the alleged offense happened within that

exact timeframe.  To be clear, to obtain a conviction, the Government must prove that the alleged offense happened either sometime within the referenced timeframe or sometime reasonably close to the referenced timeframe.

Third, with respect to the conspiracy charges, recall that one of the things that the Government must prove is that two or more persons reached an agreement or came to an understanding to distribute the relevant illegal drugs.  You should know that it makes no difference whether these persons are Defendants in this case or named in the indictment.  You should also know that the agreement or understanding need not be an express or formal agreement, need not be in writing, need not cover all of the details of how it is to be carried out, and not last any particular length of time.

Further, it is not necessary that the members of the agreement or understanding have directly stated between themselves the details or purpose of the scheme, and it is not necessary that the members of the agreement or understanding joined it at the same time.  In making your determination concerning the existence or nonexistence of an agreement or understanding, you may consider the actions and statements of each person alleged to be part of the agreement or understanding.

Fourth, another thing the Government must prove on a conspiracy charge is that the specific Defendant in question

voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or when the agreement or understanding was still in effect.  In deciding this issue, you must only consider evidence of the actions and statements of the specific Defendant in question.  You may not consider actions and pretrial statements of others except to the extent that pretrial statements of others describe something that was said or done by the specific Defendant in question.

So to be clear, with respect to Element 2 of the methamphetamine conspiracy charge in Instruction 8, you must only consider evidence of the actions and statements of Bruce Smith.  Similarly, with respect to Element 2 of the cocaine conspiracy charged in Instruction 9, you must only consider evidence of the actions and statements of Kevin Langel.  And with respect to Element 2 of the conspiracy charged in Instruction 10, you must rely -- sorry, you must only consider evidence of the actions and statements of Larry Rogers.

You should also understand that merely being present at the scene of an event, merely acting in the same way as others, merely knowing that a crime is being committed, or merely associating with others does not prove that a person has joined in an agreement or understanding.  A person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of that conspiracy does not thereby become a member.  On the other hand, a person may join an agreement or

understanding without knowing all the details of the agreement or understanding and without knowing who all the other members are.

Further, it is not necessary that a person agree to play any particular part in carrying out the agreement or understanding.  A person may become a member of a conspiracy even if that person agrees to play only a minor part in the conspiracy as long as that person has an understanding of the unlawful nature of the plan and voluntarily and intentionally joins in it.

Fifth, the Government must also prove that when the specific Defendant in question allegedly joined the alleged agreement or understanding, he knew the purpose of the agreement or understanding.  A person knows the purpose of an agreement or understanding if he is aware of the agreement or understanding and does not participate in it through ignorance, mistake, carelessness, negligence, or accident.

It is seldom, if ever, possible to determine directly what was in a person's mind.  Thus, the requisite knowledge of the specific Defendant in question may be proved from reasonable conclusions drawn from the evidence.  It is not enough that the specific Defendant in question and other alleged participants in the agreement or understanding simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  The Government must prove that the specific Defendant

in question knew of the existence and purpose of the agreement or understanding at the time he joined it or participated in it. Without such knowledge, the specific Defendant in question cannot be guilty of conspiracy even if his acts happened to further the conspiracy.

More generally, you should understand that a conspiracy can have one purpose or multiple purposes.  To help you decide the purpose or purposes of the alleged agreements or understandings in this case, you may consider the elements of the crime of distributing a controlled substance.  You are instructed that methamphetamine and cocaine are controlled substances.  The elements of distribution of a controlled substance are, one, a person intentionally transferred a controlled substance to someone else; and, two, at the time of the transfer, the person knew that what he was transferring was a controlled substance.

Although you may consider these elements in determining the purpose of the alleged agreements or understandings in this case, keep in mind that the actual charges in our case are conspiracy charges, not distribution charges.  It is not necessary for the Government to prove that the conspirators, if any, actually succeeded in accomplishing their allegedly unlawful plan.

One final point on conspiracies.  If you unanimously determine that an agreement or understanding existed and the specific Defendant in question voluntarily and intentionally

joined the agreement or understanding knowing its purpose, then acts and statements knowingly done or made by a member of the agreement or understanding during the existence of the agreement or understanding and in furtherance of it may be considered by you as evidence pertaining to the specific Defendant in question even though the acts and statements were done or made in the absence of and without the knowledge of the specific Defendant in question; this includes acts done or statements made before the specific Defendant in question joined the agreement or understanding because a person who knowingly, voluntarily, and intentionally joins an existing conspiracy becomes responsible for all of the conduct of the coconspirators from the beginning of the conspiracy.

I want to reiterate to you something that has been said in several different ways during jury voir dire and trial.  It is important that you recognize that the Government is charging two entirely separate conspiracies in this case.  The first alleged conspiracy is a conspiracy to distribute methamphetamine.  The Government is alleging that Mr. Bruce Smith engaged in this conspiracy with a person or people who are not Defendants in this trial.  The second alleged conspiracy is a conspiracy to distribute cocaine.  The Government is alleging that Mr. Rogers and Mr. Langel conspired with each other and with a person or people who are not Defendants in this trial.  No one is alleging that Mr. Bruce Smith conspired with Mr. Rogers or Mr. Langel,

and no one is alleging that Mr. Rogers or Mr. Langel conspired with Mr. Bruce Smith.

Each Defendant must be treated separately by you, and each Defendant is entitled to have his case decided solely on the evidence which applies to him.  It may be that you return guilty verdicts for all three Defendants, for only two Defendants, for only one Defendant, or for none of the Defendants; that is for you to decide by examining the facts related to each Defendant separately.

Can I see the lawyers up here for a moment before we start closing arguments?

(Bench conference reported as follows:)

THE COURT:  That was a lot.  Anything you need to object to?

MR. GIVENS:  No, Your Honor.

MR. GOLDEN:  No, Your Honor.

MR. TARVER:  No.

MR. SMITH:  No, sir.

(Proceedings continuing in open court.)

THE COURT:  Jury, you should also understand that you will have those instructions back in the jury room with you when you deliberate.

Ms. Fields, the floor is yours.

MS. FIELDS:  Thank you, Your Honor.

Your Honor, may I ask the jury if they're able to see the

PowerPoint presentation?

THE COURT:  You may.

MS. FIELDS:  Can everybody see the PowerPoint in front of you?  Thank you.

CLOSING ARGUMENT

MS. FIELDS:  Ladies and gentlemen of the jury, in the Government's opening statement, you learned that the United States intended to prove that Bruce Smith, Larry Rogers, and Kevin Langel are drug dealers.  You have now heard evidence that proves beyond a reasonable doubt that Bruce Smith, Larry Rogers, and Kevin Langel are in fact drug dealers.  Some of the Defendants may have car lots, they may have a towing company, they may be preachers, but they are all -- the evidence that you heard also confirms that they conspired to deal drugs and sell drugs.  You've learned that they don't sell drugs out in the open, that they don't make it known to the world what they do, but you have learned through the testimony of DEA agents and officers from the North Little Rock Police Department that they in fact conspired to distribute and possess with intent to distribute drugs and are guilty as charged.

As Judge Rudofsky instructed you, Bruce McArthur Smith has been charged in Count 1 with conspiracy to distribute, possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine.  In Count 2, Kevin Langel and Larry Rogers are charged with

conspiring to distribute and possess with intent to distribute cocaine.  Kevin Langel is charged with having five kilograms or more of cocaine being reasonably foreseeable to him.  And Larry Rogers is charged with having 500 -- at least 500 grams but less than five kilograms of cocaine being reasonably foreseeable to him.

Judge Rudofsky informed you of the elements of the instructions -- elements of the offenses that the United States must prove in order for you to be satisfied and to convict each of the Defendants.  As to Bruce Smith, the United States must prove that sometime between January of 2020 and August of 2022, that two or more persons reached an agreement or came to an understanding to distribute a mixture or substance containing a detectable amount of methamphetamine; that sometime between that same timeframe, Bruce Smith voluntarily and intentionally entered into that agreement or understanding, either at the time it was first formed or while it was still in effect, and that Mr. Smith knew the -- when he joined, he knew the purpose of the agreement and its understanding.

Now, if you find that we have proven each of those three elements beyond a reasonable doubt, you must convict Bruce Smith.  If you find that we did not prove those elements beyond a reasonable doubt, each one of those elements, you must find him not guilty.  If you do find Mr. Smith guilty, then you have to determine how much methamphetamine was involved in this

conspiracy; and, in that, you should determine the quantity that Mr. Smith distributed or agreed to distribute or that quantity that is a necessary and natural consequence of the agreement or understanding that were reached by Mr. Smith.  We'll get to that more in a minute.

Special Agent Brad Abbott testified early last week now about the long-term investigation into drug traffickers in the Levy area of North Little Rock that culminated in a wiretap on the telephone of Roderick Toney.

THE COURT:  I think maybe the connection is not tight enough, Ms. Heather.

MS. FIELDS:  Is it there?

THE COURT:  Now it's better.

MS. FIELDS:  Thank you.  If it goes out again, I think this monitor is connected to you guys, but if it's not, just give me a thumbs down or something.  I'll try to figure it out.

So going back to Special Agent Brad Abbott's testimony.  He talked about what led to a wiretap on the telephone of Roderick Toney's cell phone between June 24th and July 21st of 2022 and all of the communications, both the wire communications or the calls, and the electronic communications or the text messages are in United States Exhibit 1, okay?  And all of these exhibits are going to go back with you, and you will have everything that was intercepted on that wiretap with you, and you'll have a computer.

During your deliberations, Mr. Givens and I encourage you to listen to as many of those wiretap calls as you would like. Look at as many of those text messages that you would, like. But to give you some guidance, you'll have a flash drive and that flash drive contains United States Exhibits 1 through 4. Exhibit 1 is everything that we got from the wiretap.  Exhibit 2 includes a subset of calls that were exchanged between Roderick Toney and Arnold Turner.  Exhibit 3 includes the subset of calls that were exchanged between Roderick Toney and Bruce Smith, and Exhibit 4 contains the wiretap communications that were exchanged between Larry Rogers and Roderick Toney.  And they're all -- all four of those exhibits are on that first flash drive that you will see in the United States exhibit notebook.

At the outset as you begin your deliberations, I would ask that you keep in mind that the Defendants aren't charged with the actual possession of those controlled substances.  As Judge Rudofsky told you, you can consider the elements of possession with intent or distribution in determining whether or not there was a conspiracy that was reached; but, here, our case centers around the agreements that were made between the parties, not the actual drugs themselves.  You've learned now that Roderick Toney is the linchpin of these conspiracies, and you've heard the two different sides of the conspiracy, so I would like to begin by reminding you of some of the testimony of Arnold Turner.

At the beginning of the trial, Mr. Turner testified that he was introduced to Rock, who he identified as Bruce Smith.  So if I'm saying Rock, it's Mr. Smith, in Pine Bluff by his friend Tawanna Dunlap.  And Mr. Turner testified then in turn, he introduced Mr. Smith to Roderick Toney.  And the United States acknowledges that Mr. Smith and Mr. Turner's business, for lack of a better word, relationship, began with Mr. Turner having an interest in Mr. Smith providing him with marijuana that he hoped to distribute then in the Eastern District of Arkansas.

So Mr. Turner testified that he went to California.  He went there twice; one in June of 2019, and one in July of 2019.  Mr. Turner was very clear that he went there in July of 2019, and he knows that because there was an earthquake that happened while he was out there while he was in his hotel room.  While he was out there, he went to Mr. Smith's home.  He saw his marijuana grow operation.  He toured it.  And the exterior pictures of that grow operation are in United States Exhibits 6A through 6D.  You saw the grow operation beside his house in Exhibit 6B and 6C, and you saw the remoteness of that location in Exhibit 6D.

Mr. Turner testified that the first time he went out to Mr. Smith's home in 2019, that the marijuana wasn't ready yet, so he didn't get anything from Mr. Smith then.  And then when he returned in July, he came back with his friend, Roderick Toney.  And Mr. Toney toured the grow operation, said it looked nice,

but even if that marijuana was ready, he wouldn't have bought any of it because he didn't think it was good quality. But the marijuana wasn't ready, so Mr. Smith then attempted to introduce Mr. Turner and Mr. Toney to other marijuana suppliers in California, and Mr. Smith again came up short.

At that point, recall the testimony of Mr. Turner that he was done with Mr. Smith. He had been out to California twice, cost him money, cost him time, and he had no product to sell here, so he was done messing with Mr. Smith. But Mr. Toney, he testified differently, that he wanted to stay in contact with Mr. Smith, and we'll get to that in a minute. Mr. Turner -- Mr. Toney also testified that he began his relationship with Mr. Smith, for lack of a better word, over marijuana and that he traveled out to California to see Mr. Turner's -- excuse me, Mr. Smith's home and his grow operation and try to get marijuana.

On Mr. Toney's cross-examination, we learned that during Mr. Toney's first interaction with the DEA, he told law enforcement that he didn't know where Bruce Smith lived. Ladies and gentlemen of the jury, I'd ask you to keep in mind during that time, Mr. Toney's house had been raided by the DEA early that morning. There was a BearCat that was parked in his driveway, his drugs were taken, his money was gone, and it was clear that Mr. Toney's life had just taken a substantial turn. But we also know that a relationship had been established

between Mr. Smith and Mr. Toney.  We know this because -- it went out?

JUROR NUMBER 9:  We're good now.

MS. FIELDS:  I should have thought maybe a thumbs down may not be a great sign during closing argument.  Thank you for letting me know.

But Mr. Toney testified that he maintained contact with Mr. Smith because he said that they wanted to come up with a way for them to make some money, and we now know that the way they stayed in contact to make money was through a methamphetamine conspiracy.  Some time passed and Mr. Toney testified that he next saw Mr. Smith in 2021, when Mr. Smith had methamphetamine.

Regarding the timing of the conspiracy, please keep in mind that Judge Rudofsky instructed you in Closing Instruction No. 11, Paragraph 2, that -- I'm going to read it to make sure. "The Government must prove the alleged offense happened either sometime within the referenced timeframe or sometime reasonably close to that timeframe."  So as long as Mr. Turner and Mr. Toney made -- Mr. Smith and Mr. Toney made this agreement within that timeframe or sometime close to that timeframe, their agreement is sufficient to be part of this conspiracy, but go back and recall the testimony of DEA Special Agent Brad Abbott and what led the DEA to Bruce Smith.

The DEA through analyzing phone records learned that when Jason McDonald -- do you remember him? -- when Jason McDonald,

the man in Levy needed methamphetamine, he'd reach out to Roderick Toney, and they knew that Jason McDonald would need methamphetamine because they would send somebody to buy methamphetamine from Jason McDonald.  Jason McDonald reached out to Roderick Toney, and then they started looking at where Roderick Toney would call and who Roderick Toney would reach out to.  And they noticed that Mr. Toney would reach out to somebody out of state and that that phone number was associated with Bruce Smith.

During the Roderick Toney wiretap then, another phone number associated with Bruce Smith, that (760) 553-0026 phone number, was intercepted and that phone number had a California-based area code, which is one of those source states that Sergeant Briggs talked about.  Mr. Toney first testified that he first obtained methamphetamine from Bruce Smith from some apartments in Little Rock off of Stagecoach Road, and during that first time, he bought five to six pounds of methamphetamine from Mr. Smith and that he obtained methamphetamine from Rock four to five times depending on the quantity that was available, that it was always in pound quantities.  The least amount of methamphetamine Mr. Toney stated that he would have gotten from Mr. Smith would have been two to three pounds.

Remember that testimony, but please keep in mind -- and I don't mean to state the obvious, but Sergeant Briggs testified

there's 453 grams in a pound.  So if you find beyond a reasonable doubt that all Mr. Toney got from Mr. Smith was two pounds of methamphetamine or that they conspired to possess with intent to distribute or distribute two pounds of methamphetamine, Mr. Smith is still guilty of conspiring to possess and distribute -- possess with intent to distribute 500 grams or more of methamphetamine.  But the United States argues that the evidence shows that Mr. Toney purchased far more than two pounds of methamphetamine from Mr. Smith, and we hear evidence of that on the wiretap.

I want to be clear at the outset.  I am not going to play you guys every wiretap call that you heard during the Government's case in chief, but I do think it's important to consider the calls, the context of the calls, in comparison to the testimony of Arnold Turner and Roderick Toney.  And so go back, and I'd like to play for you Exhibit 3, Clip 1, Session No. 65, that took place on June 25, 2022, at 3:07 p.m.

(Exhibit published.)

MS. FIELDS:  During this call, the evidence showed that Bruce Smith and Roderick Toney needed Arnold Turner or Boo Boo to pick something up from him from that girl Boo Boo knew, that's her son.  Recall that Arnold Turner testified that the person that initially introduced Bruce Smith to -- to Arnold Turner was Tawanna Dunlap, a girl that lived in Pine Bluff.  And during this call, you heard that the two were talking about

whether or not Mr. Turner would bring change with him.  And you heard testimony from Mr. Toney that change was just an expression for money.  We're not talking about quarters and nickels here.  We're talking about substantial amounts of money.

So what happens next after -- excuse me.  What happens next?  In Exhibit 3, Clip 2, we hear that on June 27th of 2022, at 12:51 p.m. during session 132, the following call.

(Exhibit published.)

MS. FIELDS:  So, here, you can hear that Mr. Toney and Mr. Smith are still trying to get Mr. Turner or Boo Boo to go pick up that methamphetamine down in Pine Bluff.  Then about an hour later that same day, June 27th, at 1:40 p.m., during Session 138 of Exhibit 2, you hear Mr. Toney calling Mr. -- or Mr. Turner and Mr. Toney speaking on the phone.

(Exhibit published.)

MS. FIELDS:  Now, as promised, I'm not playing every call that was introduced.  I'm not showing you all every text message that was introduced.  You're going to have them with you, but recall the other conversations that were taking place around this time, that Mr. Smith was waiting on Mr. Turner's phone number from Mr. Toney.  Mr. Toney testified that he sent Mr. Smith the wrong phone number for Mr. Turner; and in Exhibit 3, Session 195, there is a text message from Smith saying, "Hey, the number is off," meaning the number is not working.  And Mr. Toney then remembered that Mr. Smith -- Mr. Turner, excuse

me, used a 501 phone number instead of that 870 number that he sent.

And how do we know that Mr. Toney sent Mr. Smith an 870 phone number?  Well, that's because in Exhibit 3, Session 180, you see that Roderick Toney texted Bruce Smith that 870 phone number.  The evidence showed that Mr. Smith didn't even have Mr. Turner's phone number anymore, which corroborated Mr. Turner's testimony, that after the failed trips to California, he was done trying to deal with Mr. Smith.  It was clear they hadn't even been in contact with each other until this 2022 meth deal.

So then we need to wonder how do we know that Mr. Turner went to Tawanna Dunlap's son's house to pick up that methamphetamine?  Mr. Turner testified that he did.  He testified that he went to the house and got a small package of drugs; and while Mr. Turner testified that he didn't open the package and he didn't know what was in the package, he could feel that it was sort of hard -- kind of, sort of hard, and that it wasn't soft.

How else do we know he went to the house and picked up drugs, because in Exhibit 2, Session 206 and 207, there's those calls that were exchanged between Roderick Toney and Arnold Turner, and they're discussing when Arnold Turner is going to get the drugs to Mr. Toney before it's ultimately decided that Mr. Toney is going to come to Pine Bluff the next day to pick

them up.  As discussed in Exhibit 2, Session 238, a call took place then on June 28th, the next day, that afternoon where Mr. Turner is asking Mr. Toney -- excuse me, Mr. Toney is asking Mr. Turner if he is at home, right?  And Mr. Turner tells Mr. Toney, "Hey, pull up."

Now, Mr. Golden asked Mr. Turner and Mr. Toney a lot of questions about what they did after Mr. Toney got to Mr. Turner's house.  And, yes, he did have trouble remembering everywhere they went three and a half years ago.  But it's reasonable to understand that the events that led Mr. Turner into this indictment are much more memorable than where Sam lives, a person he testified he hadn't met, whether or not he ate fish with a lady name Tawanna that evening, and where they went.  You guys get to determine how much weight to afford any of the testimony in any of the evidence before you.

What cannot be disputed though is that on June 28th at 4:30 in Session 261 from Exhibit 3, Mr. Toney texted Mr. Turner, "Bro, what is this I got from your people?"  You all remember that text message?  And then on June 29th, the following day in Exhibit 3, Clip 10 at 12:08 p.m., this call takes place.

(Exhibit published.)

MS. FIELDS:  Note what Mr. Smith said.  "I don't even do little ones like that, you know."  And what is that in response to, Mr. Toney saying, "It wasn't no five whole ones, just five little bitty ones."  Here it's clear that Mr. Toney

understood when he said he didn't do little ones, that Mr. Smith meant he didn't sell ounce quantities of methamphetamine. Mr. Toney agreed with Mr. Smith or conspired with Mr. Smith to purchase five pounds of methamphetamine during that transaction whether or not he actually got those five pounds of methamphetamine.

And although you can consider, like I said, the elements of possession with intent to distribute and the distribution elements, here, what matters is the agreement. And it's not necessary for the Government to prove that those five pounds of methamphetamine were actually exchanged, but that Mr. Toney and Mr. Turner had -- Mr. Toney and Mr. Smith, sorry, had an agreement to conspire to possess with intent to distribute and distribute that five pounds of methamphetamine.

Also consider that call in conjunction with the testimony of Roderick Toney; that he was expecting five whole ones, that he was expecting five pounds of methamphetamine and instead got five ounces. We weren't talking about Mr. Toney expected five ounces of methamphetamine and instead got five grams. Mr. Toney was on the stand and didn't understand what GR meant. In the context of ounces and grams, Mr. Toney didn't know what a gram was, and that's because he distributes large quantities of controlled substances.

But I also want you to recall how law enforcement knows that Bruce Smith was even the person that was using the phone

during these intercepted calls.  We know that Mr. Turner testified -- Mr. Toney testified that he was speaking to Bruce Smith, but we don't have to rely on Roderick Toney's testimony alone.

(Exhibit published.)

MS. FIELDS:  I'm sorry.  I can't figure out the sweet spot of where to click.

But recall Exhibits 5A through 5K, which showed the intercepted ping data from Mr. Smith's cell phone, and Exhibit 5A through 5E show where Mr. Smith spent a large amount of time in California.  United States Exhibit 5E corroborates the testimony of Arnold Turner and Roderick Toney, that when they visited Hesperia, California, they were visiting the home of Bruce Smith.  And how do we know that, because Special Agent Abbott testified that every one of those dots or every one of those pings represents a 15-minute interval where someone was being intercepted in that area.  Remember?  And all of that indicates that Mr. Smith was spending a substantial amount of time at the home -- at his home in Hesperia, California, that Roderick Toney and Arnold Turner identified as the home that they visited.

Then Exhibits 5G through 5K show Mr. Smith's movement when he is in Arkansas.  As you can see here from 5G, you can see that when Mr. Bruce Smith traveled, he came to Arkansas from this ping data intercepted from July the 27th of 2022, that

Bruce Smith flew from California to Arkansas, landed at the airport by those pings at 3:15. And remember who was at the airport when Mr. Smith landed? Investigator Tyler Barber said that he saw Bruce Smith at the airport that day. So at the same time that that phone is pinging at the Bill and Hillary Clinton Airport, Tyler Barber is there and sees Bruce Smith.

You can see from this data that when he landed in Little Rock, he traveled to some apartments, some apartments off of Stagecoach Road. Where did Mr. Toney say he got methamphetamine from Bruce Smith, from some apartments on Stagecoach Road. And recall the testimony of DEA Special Agent Brad Abbott who testified that the bigger circles indicate that someone is there for a period of time, but the same is true here in Exhibit 5J. Again, every one of those numbered markers indicates a 15-minute interval that somebody is intercepted at a location, and all of those markers indicate that Bruce Smith was at apartments off of Stagecoach Road, one Nandina Circle, the same place Roderick Toney was going to pick up pounds of methamphetamine from Bruce Smith.

And just to close this up, where else would Mr. Smith go when he was in Arkansas? He'd go to Pine Bluff. And sure enough, you can see that when Mr. Smith was in Pine Bluff in late July -- in Arkansas in late July, he was at apartments off of Stagecoach Road and he was down in Pine Bluff. You can see that at the bottom of your screen.

We know from the testimony of DEA Special Agent Brad Abbott that those involved in the distribution of drugs can also be involved in what he referred to as poly drug sales; meaning that somebody sells more than one type of drug.  And we certainly know that's true of Roderick Toney, and we know that's true because that leads us to Kevin Langel and Larry Rogers.

And, again, to remind you of the quantities that the United States submits has been attributed or foreseeable to each of the Defendants during the course of this conspiracy, the United States submits that as to Kevin Langel, there are five kilograms of -- five kilograms or more of cocaine that's reasonably attributable or foreseeable to Mr. Langel during the course of this conspiracy and at least 500 grams but less than five kilograms attributable to Larry Rogers during the course of this conspiracy.  And the same elements apply, and I'm going to begin with Larry Rogers.

But between April of 2022 and January of 2023, two or more persons had to reach an agreement or come to an understanding to distribute a mixture or substance containing a detectable amount of methamphetamine or possess with intent to distribute that substance, that sometime between April 2022 and January of 2023, Larry Rogers voluntarily and intentionally joined in that agreement or understanding while it was still in effect or when it was first formed, and at that time that Larry Rogers joined in the agreement or understanding, he knew the purpose of that

agreement or understanding.

Again, same is true for Mr. Rogers, that the United States has to prove each of those three elements to you beyond a reasonable doubt, and if we don't do that, you have to find him not guilty. But if you find beyond a reasonable doubt that each of those three elements have been met, you should convict Mr. Rogers of his involvement in this conspiracy. And, again, the same instructions apply that you would then have to determine the amount of cocaine that's reasonably foreseeable to Mr. Rogers during the course of this conspiracy.

Now, consider the testimony of Brad Abbott once again, that Larry Rogers served as a middleman for a cocaine transaction between Kevin Langel and Larry Rogers. Special Agent Abbott testified that law enforcement became aware of a potential cocaine transaction between Larry Rogers and Roderick Toney in July of 2022 through a text message from a known phone number at that time.

It went out?

THE COURT: It's out?

MS. FIELDS: Yes, sir. By a show of hands, can you tell me if it's -- everyone's?

THE COURT: Heather, can you see if you can help, please?

MS. FIELDS: Let me just do the equivalent of restarting.

THE COURT:  Heather, maybe you can see if our tech friend can come join us?

THE COURTROOM DEPUTY:  He's not here.

MS. FIELDS:  Heather, part of that was my fault.  I was moving this cord, making it more complicated.

THE COURT:  This is all just so you will write to your representatives to get more money for the courts.

THE COURTROOM DEPUTY:  All right, Judge.  We're good.

THE COURT:  Sorry about that, Ms. Fields.

MS. FIELDS:  No, Your Honor.

A JUROR:  It's back out.  We didn't touch it.

THE COURT:  We may have to proceed in its absence.

MS. FIELDS:  Yes, Your Honor.

A JUROR:  It's back on.

THE COURT:  As long as nobody breathes, it will be fine.

MS. FIELDS:  Judge, would it be okay if I turned this screen to the jury?

THE COURT:  It would be perfectly fine.  It would also be fine if you have handouts for you to provide them, but I wouldn't expect that given that technology should work.

MS. FIELDS:  I don't have enough.  I'm sorry.

THE COURT:  No, don't.  There's no reason you should plan for that.  The technology should be fine.

Heather, you've done your best, but if we can't fix it by

now, we'll just proceed.

That is certainly not the lawyer's fault. That is our fault at the courthouse, so don't take it out on them, at all, either of them.

MS. FIELDS: Don't move. Just kidding.

So going back to what led the DEA to Roderick Toney and Larry Rogers, Special Agent Abbott testified that he became aware of a potential cocaine transaction in July of 2022 -- I apologize, I've gotten out of order here. Ladies and gentlemen, I apologize.

Special Agent Abbott for the third time, I'm sorry, testified that there was some text messages that were sent from Roderick Toney's phone to Roderick Toney's phone that made him believe in mid July that a cocaine transaction was going to potentially take place between Roderick Toney and Larry Rogers, and on the right side of your screen, you can see that line sheet from that text message that the DEA would have intercepted. He says, "Maybe one out of two, 24,500." And Special Agent Abbott said that he knew from his experience that that was classic drug talk, and we know that's right from all of the events that conspired -- or that came to be just two days later.

We know that that phone text message was sent from Larry Rogers's phone to Roderick Toney though not just from that line sheet, but recall the testimony of Special Agent Laster, who

made contact with Larry Rogers and was with Larry Rogers when he consented for the DEA to go through his phone. That same text message sent on July 12th of 2022 at 10:20 p.m. was found in Larry Rogers's phone to Roderick Toney, and that is in Exhibit 7H.

We heard a lot of testimony about what occurred on July 14th of 2022, and we're going to get to that, but you can also see that Larry Rogers and Roderick Toney had a relationship that went back for a long period of time. Roderick Toney's phone number was in Larry Roger's phone as you can see in Exhibit 7A, and you can see in Exhibit 7D that Larry Rogers was texting Roderick Toney that somebody was in Houston. The evidence has shown through WhatsApp communications, through surveillance, that Larry Rogers's cocaine supplier, Kevin Langel, was in Houston.

The evidence also shows that on June 16th, Roderick Toney was texting Larry Rogers that he was basing things off of his coworkers and that the quality was good but that he was waiting on them. Roderick Toney explained to you what he was referring to there, that his coworkers were other drug dealers and that the cocaine or the quality of the cocaine was good, but they needed to get things together.

Here, back in June of 2022, they're talking about cocaine transactions, but then consider the testimony of Roderick Toney regarding a call that occurred on June 30 at 8:32 a.m. That's

Exhibit 4, Session 490.

(Exhibit published.)

MS. FIELDS:  What did Roderick Toney tell you happened at that storage lot even before that text message, that he met with Larry Rogers and Larry Rogers provided him with a kilogram of cocaine.  So recall that before that text message had even occurred and everything that happened on July 14th happened, Roderick Toney is testifying that Larry Rogers has given him kilogram quantities of cocaine.  Also consider the text messages exchanged between Roderick Toney and Larry Rogers and Larry Rogers and Roderick Toney show that Mr. Rogers was in -- trying to communicate with both of them to provide cocaine for these transactions to go through.  It wasn't enough for Larry Rogers to just be communicating with Roderick Toney about these drug deals, but Lanise Briggs also testified that Roderick Toney -- that Larry Rogers was getting in contact with her to try to help facilitate these drug transactions.

Consider, for instance, Exhibit 7E on June 17th, Roderick Toney sends Larry Rogers his address, and you can see the date and time that that text message was sent, Five Benham Lane. Later that night, what is Lanise Briggs texting Larry Rogers? "Hey, let me know when you get here."  That's in Exhibit 9G -- or excuse me, 9F.  And then in nine, do you remember those text messages to confirm that that meeting actually took place that then Larry Rogers is complimenting on her interior decorating

skills, calling her a nickname, Silk.  It was -- and the testimony of Lanise Briggs and Roderick Toney, that Larry Rogers came to their house and the purpose of Larry Rogers coming to their house was to discuss their cocaine dealings with one another.

Also compare the text message sent from Larry Rogers in United States Exhibit 9I to Lanise Briggs's phone, "Hey, maybe one tomorrow.  He's talking 24,500."  That message was sent on July the 12th of 2022.  Larry Rogers also texted Roderick Toney one minute after he texted Lanise Briggs.  He said -- and the text again says, "He says maybe one out of two, 24,500 tomorrow."  And that's what set into motion that extensive surveillance by North Little Rock where they knew this was dope talk.  They knew there was a drug transaction in the works.

Now, when considering we know what happened with Larry Rogers and Roderick Toney, recall the testimony of DEA Special Agent Laster.  He interviewed Larry Rogers twice, including once on July the 22nd of 2022, and Special Agent Laster testified Larry Rogers acknowledged that he completed a cocaine transaction with Roderick Toney, that he had known Roderick Toney for ten years, that he admitted that it was his voice on those recorded calls.  Remember Special Agent Laster played those calls for Larry Rogers and he said, "Yeah, that's me."  And then on July 14th, he went to a car wash to pick up currency from a female, that he didn't count it but believed it to be

around $10,000.  He left the car wash, went to a taco stand on Geyer Springs, returned to the car wash, and met with Roderick Toney.  What did Roderick Toney and Lanise Briggs tell you, that they went to the car wash and met with Larry Rogers.  And what did Roderick Toney tell you he got from Larry Rogers, a kilogram of cocaine.

But, again, we're not asking you just to believe the testimony of Roderick Toney here.  We're not asking you to consider the testimony of just Lanise Briggs, but consider the text messages that were exchanged, consider the calls that were intercepted, and consider the surveillance that was conducted. For instance, consider the call that took place on the morning of July 14th at 11:06; that's Exhibit 4, Session 1689.  And just to remind you, the other part of this morning for Roderick Toney is, he's trying to get with Larry Rogers to get a kilo of cocaine from him, right?  But he's also trying to get out of town to get to San Antonio with his wife.

(Exhibit published.)

MS. FIELDS:  Roderick Toney told you he was trying to get to San Antonio that day.  You can hear in that call that Roderick Toney was trying to get out of town that day. "Two-four-five," Roderick Toney told you, again, that that referred to the price of the kilogram of cocaine from the text messages that were sent to Roderick Toney's phone and Lanise Briggs's phone.  Now, you have it coming from Larry Rogers

himself, "two-four-five," and all of that is in conjunction with the surrounding circumstances of this cocaine transaction.  But also recall the testimony, again, of Investigator Tyler Barber from the North Little Rock Police Department, that on the morning of July 14th because they knew that this transaction was about to take place or that they anticipated it to take place, they got a warrant to allow for a tracking device to be put on Larry Rogers's truck.

Now, we talked a little bit about Lanise Briggs, and I would like you to consider her testimony as well.  I don't expect you to like her, but consider her testimony, especially that testimony in conjunction with the messages that she testified were exchanged from her phone to Larry Rogers.  She couldn't wiggle out of those text messages because it's so plainly obvious in front of even her what her husband was doing with Larry Rogers.

Note at the bottom of United States Exhibit 9I, that on July 14th at 11:40, Larry Rogers is texting Ms. Briggs, "Let Rod know that I'm down the street from the car wash now."  And then he asks, "What is she driving?"  We know that the "she" that he's referring to is Angela Robinson, the person that was actually unwittingly brought into a drug transaction.

Angela Robinson testified that that morning she and her fiancée Charles Robinson met with Larry Rogers at this car wash on Otter Creek, and they provided Larry Rogers with a yellow

package that they had retrieved from Roderick Toney's garage. And this same exchange was observed by Tyler Barber where he observed a yellow package that we now know was full of money being given to Larry Rogers from a black female, who we know is Angela Robinson.

How do we know that Larry Rogers -- aside from the testimony of Tyler Barber and Angela Robinson, that Larry Rogers was at that car wash on Otter Creek, because the tracking device that was put on his truck also put him in the area of that car wash off of Otter Creek on July 14th at 11:42. And note that that tracker time at 11:42 was sent two minutes after he texted Lanise Briggs, after Larry Rogers texted Lanise Briggs, to find out what Angela Robinson would be driving. So this corroborates that he is there and he's ready to deal with Angela or get that package from Angela and he needs to know what type of vehicle that she's in.

How else do we know that Larry Rogers met with Angela Robinson to get that cash from Roderick Toney? Because he took a picture of the bag that Investigator Barber observed being handed from Angela Robinson to Larry Rogers. He took a picture that was located in his phone when he consented to the search of his phone from Special Agent Laster. And note the date and time that that picture was taken, July 14th at 11:50, eight minutes after he's texting -- at eight minutes after the tracker puts him in the area of that car wash where Angela is saying I gave

him this package that we know contains money.  And what does he do with that picture, texts it to Lanise Briggs.  Why would Lanise Briggs care that that picture was texted to her, because Roderick Toney knew what was in that package, and he was confirming that he had received the money from Lanise Briggs -- or from Angela Robinson, I'm sorry.

Less than an hour later, now with Roderick Toney's money, Larry Rogers is observed in a party store parking lot that has a taco truck in it.  Detective Stanley testified that he observed Larry Rogers there meeting with an individual on a motorcycle that he photographed and law enforcement has confirmed and identified as being Kevin Langel.  How else do we know that Larry Rogers is in that area, because, again, the tracker on his Nissan Titan, on Larry Rogers's Nissan Titan pickup truck, put him at that taco stand off of Geyer Springs at 12:22.

Where does Larry Rogers go next?  At 12:58, where is he? He's back at the car wash, and what's he doing at the car wash, providing the cocaine that he got to Roderick Toney.  Recall the testimony of Sherwood Investigator Farquharson.  He testified that he was assisting with the surveillance, and he observed Roderick Toney getting out of Larry Rogers's pickup truck. Remember, he testified that they set up surveillance and something blocked their view and he had to move his vehicle, but they were there in time to see Roderick Toney getting out of Larry Rogers's pickup truck.  What did Roderick Toney tell you

he was doing in that truck, getting a kilogram of cocaine from Larry Rogers.

But you don't just have to take his word for what happened that day because, just minutes later, Larry Rogers is calling Roderick Toney.  In Exhibit 4, Session 1712, a call that took place on July 14th at 1:01 p.m., the following exchange takes place:

(Exhibit published.)

MS. FIELDS:  What is Larry Rogers telling Roderick Toney?  "I didn't count the money.  I just passed it on."  I trusted you, and he trusted me.

And then consider the call that took place some 45 minutes later between Roderick Toney and Larry Rogers.  This call occurred on July 14th at 1:46 p.m. in Exhibit 4, Session 1714.

(Exhibit published.)

MS. FIELDS:  Following that, recall the text message that was sent about 45 minutes later in Exhibit 4, Clip 30. This was a text sent from Larry Rogers to Roderick Toney at 2:27 p.m. asking if it was three G-R short or three O-Z short. And that's where Roderick Toney couldn't even tell you what G-R meant.  He knew O-Z stood for ounces, but he didn't know what G-R meant.

We also know that the money that Larry Rogers provided to Kevin Langel from Roderick Toney was short.  In Exhibit 17N, messages were received from Larry Rogers's phone to Kevin

Langel, and Kevin Langel advised that he was off by 15 and then corrected it and said 13.  "I just checked the bag and it was off and nobody has been around it."  Larry Rogers asks, "What was it?"  Kevin Langel responds, "15 and then 13."  And what does Roderick Toney -- Larry Rogers then turn around and do, he messages Roderick Toney to tell him he didn't have enough money and that he knew -- that he was off, that he didn't have enough money, that they were 13 short.  And we know that Larry Rogers didn't count that money and didn't know that it was $1,300 short until he got that call from Kevin Langel because remember that call you just heard, "I took it.  I trusted you.  I passed it on to him, and he trusted me."

Now, you got a lot of text messages and a lot of messages from a lot of different people, and it's helpful to consider these text messages alongside each other because it paints a broad picture of what's occurring that day.  The messages between Kevin Langel and Larry Rogers and the messages between Larry Rogers and Lanise Briggs and Larry Rogers and Roderick Toney show you exactly what was happening on July 14th of 2022.

For instance, consider the text message between Lanise Briggs and Roderick Toney where Ms. Briggs -- excuse me, Lanise Briggs's phone and Larry Rogers, where she said this was a text that was sent from Roderick Toney where they're asking for a sample, maybe.  And then a week later, Larry Rogers is texting Kevin Langel saying they want a sample.  So it's helpful to get

a full picture of what's going on by comparing these text messages with each other around the time these events are taking place.  This isn't all happening in a vacuum.  Consider the evidence alongside each other.

This is what brings us to Kevin Langel.  And, again, these are the elements, and I'm not going to read them at this point because I feel like you all have heard them enough.  I think this will be the sixth time, but it's the same thing that we have to prove for Bruce Smith and the same thing generally that we have to prove for Larry Rogers, that during the charged timeframe, April of 2022 and 2023, this agreement was made.  Again, we have to prove each of those three elements, and if you find Kevin Langel guilty beyond a reasonable doubt of conspiracy to distribute and possess with intent to distribute cocaine, then you have to determine the quantity of cocaine is reasonably foreseeable to Kevin Langel.

And, here, consider both of these prongs in determining the quantity of cocaine that's attributable to Kevin Langel, the quantity that he distributed or agreed to distribute, and the quantity that fellow coconspirators distributed or agreed to distribute if you find that these distributions or agreements to distribute by fellow coconspirators were the necessary and natural consequence of the agreement foreseeable by Kevin Langel.

The evidence presented at trial showed that Larry Rogers

had a connection to Kevin Langel.  Kevin Langel's phone number was stored in Larry Rogers's phone.  Kevin Langel's wife testified that Larry Rogers and Kevin Langel have known each other for a long time.  Recall the testimony of North Little Rock Detective Michael Stanley conducting surveillance on July 14th, the same time that this cocaine transaction is taking place, all of the various locations that Detective Stanley traveled while conducting surveillance on Larry Rogers, went to the doctor's office, went to the car wash on Otter Creek, went to the Goodwill, stayed there for about ten minutes, went to the Church's Chicken, drove through the back parking lot where ultimately they went to the parking lot with the taco stand, which is where Detective Stanley observed Roderick Toney with Larry Rogers.

But also consider the text messages from Larry Rogers's phone on that day to Kevin Langel.  July 14th at 11:58, "Hey, let's meet at the station across from Goodwin (sic).  Is that okay?  Let me know."  Detective Stanley testified that he saw Larry Rogers sitting in that Goodwill parking lot for ten minutes that day.  It's reasonable to infer that Goodwin is a typo for Goodwill, and that is where Larry Rogers initially intended to meet Kevin Langel.

While Detective Stanley was at the gas station across the street from the taco stand, Detective Stanley observed Kevin Langel there.  He first got into a black Dodge Challenger,

remember that testimony, and then they went from the Dodge -- he went from the Dodge Challenger to Larry Rogers's Nissan Titan pickup truck.  And they were in that pickup truck for a few minutes before they got tacos, and then they went and got tacos.

Detective Stanley testified that he observed Kevin Langel put something in Larry Rogers's truck, then he got back on his motorcycle, and he ate tacos while Larry Rogers left.  Detective Stanley stayed behind and attempted to photograph him.  And remember the testimony that he had the binoculars and the iPhone and he held the camera lens up to the binoculars to try to get a picture of him; that is what is presented to you in Exhibits 13A through 13B -- 12A through 13B.

Please also review the exhibits that were entered into evidence regarding the layout of the surveillance that was conducted and introduced through Detective Stanley.  You can see from Detective Stanley's vantage point at that gas station where he backed in that he could see across the street and he could see where everyone was meeting and what they were doing.  Here, the evidence shows that Larry Rogers met with Kevin Langel in that parking lot to get a kilogram of cocaine that he then provided to Roderick Toney, and he gave Roderick Toney's money to Kevin Langel.

Also consider the testimony of Brandon Davidson.  Brandon Davidson testified that he was present when Kevin Langel was arrested in 2023, and he retrieved phones from Mr. Langel.  And

then a search warrant was obtained, and Investigator Zimmerman testified that he extracted data from Mr. Langel's Samsung cell phone.  And what did he get, he got numerous photographs of Mr. Langel, he got selfies, a picture of his driver's license, tag documents, a sales and use permit for Lancam Towing.  These were all introduced into evidence in Exhibits 14A through 14H. And what else did he testify to, that telephone number (870) 718-8262 was the phone number associated with that phone.  Where else do we know that phone number exists, in Larry Rogers's phone under Lancam towing.

Investigator Zimmerman also testified that WhatsApp messages were extracted from Kevin Langel's cell phone, and those were entered into evidence as Exhibits 15A and 15B.  Also recall there were voice messages that were found alongside those WhatsApp messages, and those are in evidence as 15A-1 through 15A-2.  There is a second flash drive that has those voice clips on them, and take a minute to review those in conjunction with the messages that were exchanged.  The special agent testified that these messages revolved around Kevin Langel's obtaining kilogram quantities of cocaine.  These messages aren't referring to scrap metal.  They're not referring to precious metal.  We're not referring to used car parts.  We're not referring to busted vending machines.  These messages refer to cocaine.

On Page 1 of 15A, Special Agent Abbott testified that, to him, 18,200 refers to the price of a kilogram of cocaine in

south Texas close to the border where cocaine is cheaper. Remember the testimony of both Brad Abbott and Stephen Briggs, that along the source state, the price of drugs is cheaper than than it is once it's gotten to Arkansas because there's more drugs along those source states than there are once you get towards the interior of the country. And review those text messages and ask yourself what 18,200 could refer to. It's not an address. There's not a street name. It's not a city. There is nothing associated with that number to make you think that is an address, but instead, it is an attempt to engage in a cocaine conspiracy.

Recall the other text messages or WhatsApp messages that were introduced and those that were exchanged between Richard Ortiz and Kevin Langel and then that courier and Kevin Langel. Recall that testimony about that dollar bill, that dollar bill that was sent from Richard Ortiz to Kevin Langel that then Kevin Langel sent to the courier. It's the same picture, and the purpose of that is to make sure that the courier is talking to the same person that the supplier or Richard Ortiz is talking to; that was how they knew they were talking to the right person. And notice the time that those messages were exchanged, just less than 30 minutes apart. Kevin Langel is getting that dollar bill and he's sending it on to someone else.

Special Agent Abbott testified that the messages that followed between Kevin Langel and the courier discussed the

quantity of cocaine that could be involved in this transaction, that Kevin Langel initially expected six kilograms of cocaine. And then there's that series of messages where the courier said, "Well, it's like five." Then he said, "It's four or five." We're talking about four or five kilograms of cocaine, five or six kilograms of cocaine, but we're talking about kilogram quantities of cocaine before the two of them began to discuss location.

The conversation continued with Mr. Langel telling the courier, "Come to McDonald's. It's easier to blend in." The evidence shows that Mr. Langel advised the courier he was at McDonald's in an attempt to blend in, not to tow a truck. Common sense tells you if you're trying to drive a tow vehicle or tow a vehicle, you're not trying to blend in with anything. We've all seen a tow truck. They have bright flashing lights, traffic cones. They're not blending in with anything. It's dangerous for them to blend in. It's good for drug dealers to blend in. We also know that that's not true because Kevin Langel, when he was asked what kind of vehicle are you in, he said he's on a bike. You're not towing anything on a bike, and the courier even recognized that was a problem because he responded, "Well, damn. They're in a bucket." And you can see those messages in Exhibit 15B.

The discussion continued regarding the quantity of cocaine that Kevin Langel was supposed to receive and that he only got

four kilograms of cocaine.  And you can see in Exhibit 15A on Page 8 that he sent a screen shot of his conversation to the courier, to Richard Ortiz, when Richard Ortiz says, "Make sure they know you're short."  He sends that screen shot to say, "I told him I was short.  This is my conversation with him."  And you can see that conversation from 15B is exactly what was screen shot in 15A and sent to Mr. Ortiz.

And remember that they talked about how they were sitting, that Mr. Langel was waiting to see if they could get this transaction sorted out.  What did Mr. Langel say?  "I can't wait too long.  I'm a sitting duck."  He's a sitting duck because he had a bucket of kilograms of cocaine with him.  That's why he was a sitting duck.  You are allowed to use your common sense when you're deliberating and take into account the entirety of the context of this conversation.  Kevin Langel is not a sitting duck because he was driving a 53-foot tow truck and was sitting on the side of the road; that's what Ms. Briggs -- Ms. Langel testified, that if he had a big tow truck and he was sitting on the side of the road, he could be a sitting duck.  That's not what's happening here.  He's a sitting duck because he's got a bucket of cocaine.

How do we know this took place, this transaction took place?  Consider the entirety of those WhatsApp messages.  "One in the clear, 34 short."  Special Agent Abbott testified that means one of the kilograms is good, the others are short on

quantity.  And "Another one with the same amount.  It must be the testing."  Of course, they're talking about kilogram quantities -- they're talking about testing the purity of drugs.

Ms. Langel's home address is in these messages; that shows you ladies and gentlemen that this wasn't a situation where somebody hacked into Mr. Langel's WhatsApp account and is sending messages; that's not what happened.  His home address is being sent from these WhatsApp messages.  I'm not going to belabor them, but read them and listen to the audio messages that are also exchanged, the audio messages that discuss the purity.  Remember that one message where it says, "They're really good.  They're hitting 98."  They're talking about cocaine here.  Special Agent Abbott testified they're talking about the purity of the cocaine and that it's hitting 98 percent, that it's 98 percent pure cocaine.

Finally, remember those text messages where Mr. Langel is trying to get in touch with his supplier afterwards to try to establish a relationship where he could get more cocaine and he's not hearing from the person he's trying to get in touch with.  Mr. Ortiz tells him, "Call him through a normal call." And what does Mr. Langel reply, "That's not wise."  Why is that not wise, because Brad Abbott might have a wiretap on you; that's why that's not wise.

You've heard this evidence.  You know the proof in this case, and you have heard testimony of the involvement of Bruce

Smith with Roderick Toney, Larry Rogers with Roderick Toney, and Kevin Langel with Larry Rogers.  You're not being asked to consider the testimony of Roderick Toney alone.  You're not even asked to consider the testimony of Arnold Turner alone.  But when you consider all of the evidence that's before you, all of these messages, all of these calls, everything, the surveillance of law enforcement, all combined, the evidence proves that Bruce Smith is guilty beyond a reasonable doubt of conspiring to distribute or possess with intent to distribute 500 grams or more of methamphetamine, that Larry Rogers and Kevin Langel are guilty beyond a reasonable doubt of conspiring to possess with intent to distribute or distribute cocaine, with Larry Rogers having at least 500 grams of cocaine attributable to him, and Kevin Langel having over five kilograms or more attributable to him.  Thank you.

THE COURT:  Thank you, Ms. Fields.

Jury, we're going to take our last break, or at least what I imagine is going to be our last break, before eventually we completely wrap things up and you go back to deliberate.  I am going to give you about 15 minutes.  If, for any reason, you know, you need to go back to your car or you need to, you know, call someone to sort of say, hey, I'm not going to really be in communication after this for a while, that's all fine.  This is the appropriate time to do that.

After this break, I imagine what's going to happen is

you're going to hear closings from one or more of the Defendants, you will then hear a rebuttal closing from the Government, and you will then go back to deliberate.  Once you go back to deliberate, you all have to stay together as a group. That is why -- so I guess, actually, I probably should give you between 15 and 20 minutes.  If it takes 20 minutes just because of going in and out of the courthouse, I am okay with that.

It is right now -- when I get done with this, it will be about five to 11:00, so I will ask you all to be back here at 11:15.  I am not going to read you the recess instruction.  You all know the recess instruction.  You are required to follow the rules of the recess instruction.  I will ask you to leave your papers, your notebooks, upside down on your chair with your pens on top of them, and you are excused until 11:15.

(Jury exits.)

THE COURT:  Everybody be seated.

Mr. Givens, anything I did or said in that last session or your opposing counsel did or said that you need to object to?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  Anything before we take a break?  I will take no -- I'll take silence as a no.

Okay.  We're going to be on break.

(A short break was taken from 10:54 a.m. to 11:13 a.m.)

THE COURT:  Mr. Golden, are you ready for our jury?

MR. GOLDEN:  I am.

THE COURT:  Everybody ready for our jury?  I will take silence as yes.

Okay.  Then let's invite back in the jury.

(Jury enters.)

THE COURT:  Everybody be seated, please.

Mr. Golden, whenever you are ready.

                    CLOSING ARGUMENT

MR. GOLDEN:  Good morning.  Good morning.

As I told you a week ago, I'm Robby Golden, and I represent Bruce Smith and Bruce Smith alone.  The judge is going to try to tell you that we've got to keep these separate, so only apply the evidence you've heard as opposed or -- to Mr. Smith, to him. You don't apply anything from Mr. Rogers, Mr. Langel, and lump Mr. Smith into that.  That's not how this works.  It needs to be clear on the instructions, and you guys get that, but it's incumbent upon me to say that.

So when we started, you started this factfinding journey, you're now at the end of it.  You get to decide what the facts are here.  You get to decide who you believe, who you don't

believe, what you believe, what you don't believe, and ultimately you're to decide whether you think someone is guilty beyond a reasonable doubt or not.

I want to start with Briggs, Sergeant Briggs.  He was one of the first witnesses to testify to you, and he was very clear that you have these polysubstance drug dealers who deal in more than one substance.  And we all agree that is what Roderick Toney does.  He doesn't just sell methamphetamine or cocaine or fentanyl or marijuana.  He sells all these things, is what he does.  And Sergeant Briggs told you that it is not only -- not that it's not uncommon, it's common for polysubstance drug dealers to have multiple sources of supply.  I asked him why is that, well, because drug dealers are unreliable.  You might not always get what you ask for.  You may get shorted a time or two.

Now, why is that important?  That's important here because of the evidence as to Mr. Smith and what's been presented to you and what we know, the few facts that we know of what happened. Now, I'm not going to play every phone call for you.  I would, if I needed to; but I don't think I need to.  I do want to make sure our timelines are correct.  I believe Ms. Fields did a pretty good job of explaining that, and you've all heard it. And as I said in opening, you guys are great note-takers, so I have no concern about that.

The wire goes up on June 24th of 2022.  June 25, 2022, you capture Bruce Smith and Roderick Toney talking about drugs and

Boo Boo going to pick them up; that's true. Now, what drug is that, that's where we differ, okay? On June 27th, you had Toney call Arnold Turner, Boo Boo, asks if he wants to make some money. Of course Arnold Turner wants to make money because who doesn't. At that time, Mr. Toney agrees to give Boo Boo $150 at first. Well, then he decides I'm going to give you $200 to go pick up what Toney believes is five pounds, but he's only going to give him $150 or $200, if you believe Toney, to go pick up five pounds of methamphetamine that would subject him to a ten-year minimum sentence? I got friends. They're not going to subject themselves to ten years for $200. That's not going to happen. Marijuana, maybe, maybe. That all happens on June 27th.

On June 27th, you've also heard Boo Boo goes and picks something up. Boo Boo, should you believe him, that's up to you. You heard his testimony, should you believe him. 2019 we go to Mr. Smith's operation, his growing marijuana in 2019. That's what he's doing. Fast forward to 2022 in June, Boo Boo is told to go pick up a substance. He says, I don't know what it is, I don't know what I'm picking up, nobody told me. I have no idea. I don't know what it is. I don't know the amount. I don't know what it's supposed to be. I'm just going to go grab it for $200; that's what I'm going to do. He goes and grabs it. I don't know what five ounces of marijuana vacuum-sealed feels like; I don't. I don't know what five ounces of methamphetamine

vacuum-sealed feels like.  Kind of hard, not soft, I don't know. But he goes and picks it up.

If you recall, there is a phone call at the end of June 27th, two actually, but Boo Boo calls Roderick Toney, says, "What do you want me to do with this?"  It's safe to assume that he has picked up whatever substance we're talking about at that point and saying, Roderick Toney, what do you want me to do with it.  Again, mind you, if it's five pounds of methamphetamine worth -- I don't remember how much, a lot of money, just sit on it because that's what Roderick Toney says.  I'll come get it tomorrow.  No problem, I'll come get it.  You heard those two phone calls.  In those two phone calls, in no way whether by code or by just I just know you was it given to Mr. Toney that this is short.  Mr. Toney testified I knew.  The night of the 27th, I knew it was short.  He did not.  Boo Boo just says, "What do you want me to do with it?"  "I'll bring it tomorrow." There is no code word for, hey, man, you got shorted tonight. You better figure it out.  That doesn't happen.  That doesn't happen until the following day.

I am going to skip -- I'm going to jump back and forth on you real quick, but there was the text message on June 28th at 4:30 p.m., and that was the text message from Roderick Toney to Bruce Smith saying, "Bro, what is this I got from your people?" You don't have any proof short of Mr. Toney's testimony.  You don't have any proof that he knew he was short until that time,

until June 28th at 4:30.  That's when he knows he's short on a substance because he's selling multiple substances.

I played for you, and I am going to play it again, Session 349.  That is June 28th at 9:55 p.m.  Now, it is an eight-minute conversation.  I am going to skip ahead to the four-minute mark.  This presupposes that our technology will work.

(Exhibit published.)

MR. GOLDEN:  Now, to be clear, Session 349, phone call between Roderick Toney and (501) 398-0999, that is the number that he, on the phone call, refers to as B.  B who?  Well, B Hayes is the last name we got.  B's first name, just B.  I don't know.  That's what we got.  I am going to fast forward to four minutes.

(Exhibit published.)

MR. GOLDEN:  B is going to be gone for two weeks.  B is a source of supply for a drug for Roderick Toney.  That drug is marijuana; there is no question.  Mr. Toney told you on the stand, I didn't get shorted by anyone else besides Bruce Smith, no one, but he's needing some more.  He needs to get another one.

(Exhibit published.)

MR. GOLDEN:  Lemon cherry gelato, that's how we know it's marijuana, and Mr. Toney agreed that's a strain of marijuana.

(Exhibit published.)

MR. GOLDEN:  "I can't be running around here looking silly."  Why is he going to look silly?  He testified to you that's his personal use.  That's all he's getting from B, and he is going to look silly because he doesn't have enough to smoke himself.  Is that the story we're going with?  Also, mind you, in this phone call the next day to Bruce Smith, he says, "You made me look silly."

(Exhibit published.)

MR. GOLDEN:  That's desperation.  "I'm not going to have enough weed to sell my customers."  You can hear it in his voice.

(Exhibit published.)

MR. GOLDEN:  He's rolling around down in Pine Bluff with his partners.  "Wasn't nothing but a little come up, but this will help."  That's because instead of five pounds of marijuana, he got five ounces of marijuana.  What did he say?

(Exhibit published.)

MR. GOLDEN:  He needs to leave it in his little spot so he can go get it because there's a timing issue of getting to it.

Now, Ms. Fields, I feel like, is making excuses for Mr. Toney's testimony that he can't tell you what he did that day.  Well, okay.  He can tell you the part that's important to the Government.  He can tell you the part that he needs to say that is the truth to get his time off, but when I ask him simple

questions about, well, how did the rest of that day go, and even about B and about Sam, I don't know what he's buying from Sam. But I played you the audio where he and Boo Boo are driving by there, I assume to get something, but I can't tell you where Sam lives other than Little Rock because Mr. Toney would not give that to me.

Now, you can choose to believe he doesn't know where his friend of multiple years that he goes to his house three years ago and he's a lifelong resident of Little Rock, but he can't tell you where in Little Rock that man's house is.  Is that reasonable?  I'm not -- I didn't give Mr. Toney a hard time. I'm sorry if he had to come here early for court and testify. I'm sorry if he had to testify to 6:30 or 7:00 p.m.  I'm sorry about that.  That's real bad.  He is working on getting up to five years off his sentence, and I feel real sorry for him.  But I wasn't rude to him.  I didn't trick him.  I wasn't trying to make him -- embarrass him, make him feel bad.  The least he can do is answer my questions, at least try.  He's not trying.

It's not just forgetfulness either.  You can forget things. When you get up there on that witness stand, each and every person that came in here swore to tell the truth.  They told Heather, I swear to you I'm going to tell you the truth, the whole truth, and nothing but the truth.  Did Arnold Turner and Roderick Toney do that?  You can forget things.  You don't get to have a memory of convenience.  You don't get to protect your

friends that have lived in Little Rock with you your whole life that you have sold drugs with for who knows how long, and then decide, guess what, the guy from California that -- he's not my friend; that's Roderick Toney's testimony. We're business associates; that's it. That's the person.

Let's talk about Mr. Smith. Heather, can I get the ELMO?

THE COURTROOM DEPUTY: Yes, sir.

MR. GOLDEN: Government's 6C.

Mr. Smith lives in this house. He grows marijuana in that shed; that is the testimony. Government 5E, this is when the Government had a phone ping warrant for Mr. Smith's phone. Mr. Smith is a homebody. Those are all 15-minute intervals. This is all before that trip -- second trip to Little Rock where there's no -- he came to Little Rock. We don't have any proof that he did anything illegal there, but we want you to suspect he did.

Nonetheless, he sits in his house, he watches TV, and he grows marijuana. That's what that proves. And that's in July of '22. That's not June or whatever 2019 when they went to his house to see the operation. And everybody laughed at me. I asked Agent Abbott, we know that he's got a grow operation there. I said, is there any evidence that he has a meth lab there? We don't cook meth in America anymore. It's not what we do. Well, is there any evidence that he went somewhere to pick some meth up before that next trip to Little Rock? No. No.

He's at the house.

There was some testimony -- and I want to be clear.  I want to foreclose some things because you have the wire data.  You're going to have the wire data.  I openly shared this wire data with you and what I argue I believe it means.  I'm telling you what I think it means, but you got it.

Now, there was some testimony that, hey, we can beat the wire by encrypted text messages; okay.  I very specifically asked Agent Abbott who took a phone dump, which was, you know, a complete copy of Roderick Toney's phone, and asked him was there any encrypted apps used, text message, or any encrypted text message from Mr. Smith.  The answer is, no, there weren't.  So we don't get to go outside of this wiretap and say let's speculate, let's say he could have contacted some other way, he could have talked about either a price to tell you what kind of drug it was, or tell you what kind of drug it was, or tell you anything.  But there's nothing outside of what you have.

And the judge told you, but I'm up here arguing to you, my word is not evidence.  I'm here trying to convince you of what I believe to be right.  If you take all the evidence you have and you swap marijuana for what they say is methamphetamine based solely on Roderick Toney's testimony, who puts it on the guy he doesn't like, that's not fair.  That's not his friend.  It's a business associate.  And I submit to you it is a much easier task from Mr. Toney's standpoint to put it on the weed grower in

California as opposed to any legitimate meth dealer, especially considering in July of 2021, he got shot. It's not safe.

The phones that were covered in 2021 didn't have any text messages between Bruce Smith and Mr. Toney. And I appreciate the indulgence. I'm not going to belabor this. And I am going to get out of your way just here in a second; I promise. But what they want you to believe is the man that couldn't grow good enough marijuana to satisfy Roderick Toney -- not only that, he could not put him in touch with someone on that 2019 trip to get marijuana he wanted, within two years becomes his source of supply for pound quantities of methamphetamine. Remember the common sense part that we bring in here?

Not to mention, on the stand, when I put the little headphones and let him listen to his interview in June or July of 2022, Mr. Toney's interview, he told you he was getting two to three pound quantities from Bruce. Fast forward to February 2026, it's five to six pounds, and that's because that is the only way that will fit the narrative of five pounds, five big ones, five little ones. That's why.

I want to go through just a couple of the jury instructions with you. I'm sorry, because I know you listened very carefully to those. I know, I'm confident, during opening I would have told you and you heard it through the preliminary instructions that you get to decide what testimony you believe. You get to decide who's telling you the truth. You get to decide who's

not, each individual.  And you're going to come together and make that decision, but you get to decide that.  And that's what this instruction will tell you.  You can believe some of it. You can believe none of it.  You can believe a portion of it, all of it.  You decide.

But in order for you to convict Mr. Smith, you are going to have to take Mr. Toney and find him to be a credible witness, and you get to take in not only that the judge read you the instruction about his cooperation and what he stands to gain. And I told you and he admitted on the stand that he had a number of charges dismissed, including fentanyl, two fentanyl charges, we're out of here.  You get to consider all of that, but then just as a human being, you get to consider his demeanor and his responses.  And if you found that to be truthful, I'm wrong. Robby is wrong.

Boo Boo honestly from what he said I guess didn't hurt me. He says he grew marijuana.  He doesn't know what was in the package, but was he telling the truth?  He just started making stuff up.  I mean, they both testified they left each other that day in Pine Bluff on the 28th; that's not true.  But pressed on it, well, I must have went to a girl's house.  Who?  Tawanna, Tawanna Jackson.  Tawanna is a person he met the day before. Tawanna Jackson is fictional.  That's the testimony that's been presented to you by the Government that they get to decide is true or not when moving to give them a reduction in their

sentence.

The Government gets to decide the narrative; I don't. They get to start the investigation. They get to get the wire. They get to listen to the wire. They get to decide who they seek to indict. When they're wrong, like Ms. Robinson who was indicted for selling cocaine, they dismissed against her. She came to give testimony. Maybe the only credible person you heard from, but mistakes were made. Charged with cocaine, we're wrong. They get to make all the decisions until I get to come in here and talk to you. And when I come in here and talk to you, and I show you what I'm showing you -- it's not my job to show you. It's their job to prove to you beyond a reasonable doubt, which I contend they have not done, but I have shown you why. I have given you the evidence as to why it's untrue.

So an indictment is had, Mr. Smith is charged with distributing methamphetamine, and I come in here, and you and I get to make the decision. Hey, Government got it right, Government got it wrong. That's up to you, not me. I submit that they got it wrong, and should you agree, Judge Rudofsky mentioned the verdict form to you. This is the verdict form. When you go back there and deliberate, you've got two more cases to listen to and two more cases to decide, treat me separately. Go back there into that room, choose your foreperson, discuss your case, write not guilty on that verdict form, two words, and have your foreperson sign where it says foreperson. And you can

move on.

I will end with my appreciation.  I don't think I'm the last person you'll hear that from.  We mean that when we say that; we do.  But find Mr. Smith not guilty.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Golden.

Mr. Tarver, when Mr. Golden -- sorry, go ahead.

MR. TARVER:  I need the mic.

CLOSING ARGUMENT

MR. TARVER:  Good morning.

This is the last time I will come and speak to you.  I told you when this case started that the issue that I wanted you to pay close attention to was whether the Government could prove beyond a reasonable doubt that Larry Rogers voluntarily and intentionally joined in a conspiracy to distribute cocaine.  Did he know the purpose of the agreement that the Government alleges that he participated in and that he joined?  I'm not going to rehash the testimony and the evidence.  You've heard it.  You've seen the evidence in this trial.  You've heard the testimony of the witnesses, and now, it's your job to take that evidence and that testimony and apply it to the law as the judge will give it to you or has given it to you.  And it's with that evidence and the law that you will deliberate.

Now, the first thing I want to talk about is Roderick Toney.  He came in here and he sat on that stand and he

testified.  I believe he told you that Larry Rogers pressured him into selling cocaine.  His thing was he sold marijuana.  He had never sold anything else.  This is a man who also testified that he had been dealing drugs from the time that he was 18 years of age.  He's now 58 years old.  This wasn't something new to him.  If you'll recall on cross-examination when Mr. Golden asked him about selling marijuana, "Naw, I wasn't selling marijuana."  The talk about marijuana that you heard was for my personal use, but at the same time, he's telling you this is all I sell.  But he was adamant that he wasn't selling this marijuana.

Now, one of the things that you could take into consideration is an individual's motive for testifying, and that was what all of the talk was about what he's getting out of this.  Mr. Toney is not new to this.  So as soon as he gets caught, the first thing he wants to know is what kind of a deal can I get, and he struck a deal with the Government to come in here and testify.  And he told you I'm hoping for some sort of sentence reduction, and then he made a big issue about him having to tell the truth even to get that consideration.  But you get to decide whether or not you believe his testimony.

Now, Mr. Rogers is charged with joining in a conspiracy; that's an interesting concept.  And if you look at the jury instructions that the judge has given you, and you'll get to take copies back into the jury room, you can review what he read

to you.  You don't have to try to remember what he said, but you could actually do things that appear to further along the conspiracy without actually joining in that conspiracy.  So one of the things the Government has to prove to you beyond a reasonable doubt is that Larry Rogers intended and volunteered to join that conspiracy.  It's not just about associating with Roderick Toney.  It's not about being with Roderick Toney.

Now, you were shown text messages and played phone calls between Mr. Rogers and Roderick Toney.  I would encourage you to listen to those calls, review those text messages.  I'll submit to you that Mr. Rogers didn't understand exactly what was taking place.  The individual that was driving this whole thing was Roderick Toney, and the problem with Roderick Toney is anyone and everyone that came within his orbit became a vessel or a way for him to get what he wanted.  And he didn't care about what harm it would do to those other individuals.  All he cared about was how it would help him, how it would further what he needed, what he wanted.  And one of the things I want you to take into consideration when you start deliberating is think about the other individuals that came within his orbit.

So you heard the talk about him calling Boo Boo to pick up something.  He offered to pay him for doing that, but Boo Boo was in the same business.  They had met in prison, continued their relationship outside of prison, engaged in drug dealing, and so this is what they did.  But the other people, they got

caught up in this. How did that happen? Was this their intent? Was this the intent of Mr. Rogers? There was no testimony about Mr. Rogers receiving anything out of this. You heard the agent, specifically Officer Briggs, testify that people are trying to make money when they do this. That is the object of drug trafficking.

What did Mr. Rogers get out of this? There is no testimony, there's no evidence that's been presented to any of you that he received anything. There's talk about the 24-five, but where does that come into play? The testimony was, per Roderick Toney, that there was $13,000. But we don't know what was in that bag. We don't know how much was in that bag, because if you listen to the phone call from Mr. Rogers, "I didn't open it. I didn't count it. I just passed it on to you. I trusted them like I trusted you." There is no talk about what's in it for me.

I'll submit to you the same thing when you look at how Roderick Toney would bring people into his orbit for what he needed. Angela Robinson, he talked about his sister-in-law, sending her over to the house to pick up a package to deliver. He didn't care about her. He didn't care about the position that he put her in. The only thing he cared about was how it would benefit him, and I submit to you that's the same thing that he did to Mr. Rogers. He can come in here and tell you all day long it was Mr. Rogers who was pressuring him into doing

this deal.  Listen to the phone calls.  Read the messages.  It was Roderick Toney pushing Larry Rogers to do something for him with nothing in return but a possible prison sentence.  That's it.  That's what he could potentially get out of this.

I think when you look at his motives or motive for testifying, there has to be some things that you question.  It's like when the Government would ask him questions, he had almost perfect recall about events, about the phone calls, about the messages, about what they meant.  It was his interpretation that he wanted you to believe as to what was taking place.  But on cross-examination, when asked about the same phone calls, about the same text messages, he had no idea what took place.  I specifically asked him about his having back surgery and about whether or not Mr. Rogers prayed with him about his back surgery.  But, no, no, he's never prayed with me.  He's never prayed for me.  He prayed with my wife over the phone, never anything to do with me.  Then she came in here and told you, oh, yeah, he prayed for him when he had his back surgery.  Roderick Toney didn't care anything about his relationship with Mr. Rogers other than what Mr. Rogers could do for him to help him get what he wanted.  So one day.

So Mr. Rogers ends up -- because Roderick Toney has a wiretap on his phone, DEA attaches themselves to Mr. Rogers. They get a tracker to place on his vehicle.  They follow him around, but the focus of their investigation was Roderick Toney.

They didn't get a tracker for his vehicle.  They weren't following him around.  They came in here and testified that they witnessed what they believed to be a drug transaction.  The individual that they were seeking to gain criminal evidence against, Roderick Toney, they didn't bother to follow him.  They didn't bother to stop him.  If they believed that a drug transaction had taken place at that time, the person that they were investigating should have had a kilo of cocaine on him at that time.  And they knew this.

Agent Laster told you that when he sat down with Larry Rogers, he met with him on two occasions.  The first time Mr. Rogers told him that he thought that they were talking about marijuana, and then he later figured out that it was cocaine.  I submit to you that Mr. Rogers had no idea what he was doing.  Think about it, when Roderick Toney was questioned about drug weights, he could break them all down to you all all the way down to a gram.  He couldn't go that low because he never dealt in grams.  But in his messages or in messages to Mr. Rogers after the fact, Mr. Rogers was questioning what was it, ounces or grams, even to the point that he was Googling what is the price of cocaine, how many ounces are in a brick of cocaine.  You have those images from his phone, and as you deliberate, I ask you to find that Mr. Rogers is not guilty.  Thank you.

THE COURT:  Thank you, Mr. Tarver.

Mr. Smith, it's totally your call, but if you're not going

to use the lapel mic, you have to make sure you stay on --

MR. SMITH:  I just need a second to set up.  Thank you for saying that.

THE COURT:  No.  No.  That's perfectly fair.

CLOSING ARGUMENT

MR. SMITH:  I told you at the beginning of this trial about soup and gumbo.  What I didn't tell you is I am a third-generation Louisianan, and we love our gumbo.  My sweet momma, she just frustrates the dickens out of me sometimes because these fights we have about restaurant gumbo.  See, I told you that while soup and gumbo have similar ingredients, water, spice, chicken, shrimp, rice maybe, the key thing about gumbo is the roux.  So we go to these restaurants, I'm, like, here we go again because mom orders the gumbo.  And she says, oh, this ain't no gumbo because it's missing the roux.

Now, in a -- can we switch to the monitor, not the ELMO?  You all remember these ladies from Wendy's.  I loved those commercials when I was a kid.  Where's the beef?  Where's the beef, they'd say.  You can turn that off.  I thought about those ladies in this case because in a drug conspiracy, just like with a gumbo where you got to have roux, you need drugs.  Where's the drugs?

Now, I want to walk through this case with you, and I want to talk about what's missing from this soup that the Government wants to tell you is gumbo.  It relates to my client, Mr. Kevin

Langel.  No photograph of Mr. Langel with drugs.  Now, think about this:  We all carry these little devices around, and the judge told you you can think about your own daily life experience as you evaluate this case.  You can use your common sense.  Think about these little devices.  I'll tell you some stuff that the Government would find if they ever got ahold of mine, all kinds of weird stuff.  I'm a 50-year-old man that loves action figures, so there's always kind of messages in my phone about action figures, boxes of them, prices of them, numbers for them, years, 1983.

The Government took Mr. Langel's phone and made a clone of everything he had, every picture, every text messages, every e-mail, every phone call, every contact.  They didn't find any photographs of drugs.  No photographs of money.  No videos of drugs.  You don't have any -- I would tell you to listen to the phone calls.  Like the other attorney said, there ain't none. There's no phone -- phone calls with Mr. Langel's voice.  You don't even know what his voice sounds like, no recording of him planning a drug deal.  There is no controlled buy.  A controlled buy, who ever heard that before?  It's when the Government sends some dude to you to buy some crap that they know you've been selling.

So I get these cases sometimes, and the Government sent Pookie to Ray Ray's house to buy some meth, and Ray Ray always wants to say they entrapped me.  They entrapped you?  Pookie

just came up there to do something you was just doing anyway. Controlled buy, really good evidence at trial. There is no controlled buy with Mr. Langel. Most importantly, they didn't find any drugs on Mr. Langel.

Now, the Government had the burden of proving this was a conspiracy, not just any conspiracy, a drug conspiracy. So they need to prove that Mr. Langel and others agreed to distribute or to possess with the intent to distribute a controlled substance, that he voluntarily and intentionally joined in that agreement. Now, they also need to prove that he knew what this agreement was for.

Here is the key problem with this case: The box. There is a lot of WhatsApp messages about some boxes. What's in the box? What's in the box, ladies and gentlemen of the jury? Agent Abbott, I will give him this, told the truth on this key point. I said, Agent Abbott, "If you never found the drugs, how you know what drug it was?" Bam. "I know what they mean when they say this." "You think you know what they mean when they say this, Agent Abbott. If you never found the drugs, how do you know how much it was?"

Well, Agent Abbott, greasy little pig, he didn't want to give it to me. I had to tie --

MR. GIVENS: Excuse me, Your Honor. May we approach?

THE COURT: Yes. Come on up here.

(Bench conference reported as follows:)

MR. SMITH:  That was a slip of a tongue.

THE COURT:  What did you just call him?  You're going to get in front of the jury and you are going to apologize for being disrespectful in my court.

MR. SMITH:  Absolutely.  Absolutely.

THE COURT:  And you're going to tell them there is no reason for you to call him that and that you are entirely wrong.

MR. SMITH:  I am absolutely going to do that, Judge.

(Proceedings continuing in open court.)

MR. SMITH:  Ladies and gentlemen, I want to apologize to you, and I want to apologize to Agent Abbott.  I am from the country, and I used a colloquialism about farm animals and especially ones that can be slippery, but it also has a very negative connotation towards law enforcement.

THE COURT:  Let me stop Mr. Smith right there. Mr. Smith is now not doing what I told him he had to do.  I told Mr. Smith that he had to apologize for that outrageous comment, and instead Mr. Smith is now trying to explain to you why he made that comment.  Apologize and move on.

MR. SMITH:  Yes.  I'm sorry, I should not have said that.  And, again, Agent Abbott, I'm sorry.  And, again, I'm sorry, ladies and gentlemen.  And I'm sorry to the Court.

THE COURT:  You should be.

MR. SMITH:  What I meant to say was that he didn't want to concede that at first, and I had to squeeze on it.  And,

finally, he did say that, without having the drugs, he could not say for certain what they were or how much of them that they were.

That's very important here because to prove this case, the Government needs to convince you beyond a reasonable doubt that it was a -- oh, I'm sorry, I don't intend to be sharing that anymore -- that the substance was cocaine and how much it was. Mighty hard to do that beyond a reasonable doubt when you never found the substance. Could I get the ELMO back up?

What does it mean to prove something beyond a reasonable doubt? The judge instructed you on that. I want you to look closely at it. A reasonable doubt is doubt based upon reason, common sense. It's not doubt based upon speculation, and it's often found when there's a lack of evidence. And the best example I like to give juries is you have doubt when you hear the Government's case and you still got questions. So let's talk about what you heard in this case. Let's start with Roderick Toney and Turner.

Mr. Turner said, "Hey, I worked with Roderick Toney, worked with him a long time." He said, "I moved meth for Roderick Toney." "I went with him on marijuana scouting missions." He said he'd known him for years and that they sold large amounts of drugs. Think about what Toney said. "Hey, me and Arnold worked together." He said that he mostly sold weed and, every now and again, he dabbled in cocaine and other substances, said

he knew what he had been doing, been doing it for years.

Now, I want to talk about using that gumbo metaphor again. What are some of the ingredients that the Government can use to make this gumbo?  Wiretaps, those recorded phone calls; controlled buys; drugs found on the person; photographs; videos of drug deals; GPS vehicle tracking; finding large amounts of money on the person; crime lab reports.  Again, you've heard me say this a few times; no drugs found on Mr. Langel, no recordings of him making a deal, no video of him doing a deal. And that's really important because Agent Abbott said that after this first alleged transaction in July of 2022, they investigated Kevin Langel for a year.  For one year, they investigated him; and, still, they don't have any of that hard proof to offer you.

Now, I want to go back to the very beginning.  The first witness you heard from was Sergeant Briggs, and he really was a sharp person and educated all of us about how all this works. Now, he gave you a lot of code words for this drug activity; elbow, that's a large amount; itty-bitty, that's a small amount; whole one, that's a pound; kilo.  And he also said you'll see the word short, but he did concede that words can mean different things to different people.

Now, the Government has given you some text messages, some WhatsApp messages, that they say came from Mr. Langel, that came from Mr. Langel's phone that they say he sent.  I want you to

look for these key words.  I don't believe you're going to see the word elbow.  I don't believe you're going to see itty-bitty one, whole one.  I won't deny you're going to see the word short.

Now, Sergeant Briggs also talked about how all this works. There is tools of the trade just like anything else.  The dealers, they typically have scales to measure their product, to make sure they hadn't been left short.  Sometimes they'll have plastic wrap to put that stuff in, and they typically found cash, again, none of which was found on Mr. Langel.  He told you about the tools law enforcement uses on their side of this to keep these drugs off the street.  And let me say to you something that should have been said, none of us want drugs on the street, none of us do.  But they have aircraft; they have wiretaps, video equipment, vehicle tracking.  Again, none of this -- none of that in regard to Mr. Langel.

Agent Abbott, again, he said that they had a wiretap on Toney's phone.  He said he's never heard Kevin Langel's voice on that wiretap.  He said that dealers are typically found with cash.  Again, no cash found on Langel.  He admitted that Kevin Langel, as far as he knew, did not know Roderick Toney or Bruce Smith.  He talked about the controlled buys that they made on Toney's operation.  And I'm going to tell you, I know that the Government told you at the very beginning, hey, this might not be what you see on CSI, but it sounded like CSI to me.  They

really worked their ladder -- their way up the ladder in Toney's organization. But, again, no controlled buys on Kevin Langel, no drugs found on Kevin Langel.

Agent Abbott said that Toney was a big dealer, had a history of selling weed. They searched Toney's home. They found no cocaine in Toney's home. Now, my recollection, I wrote in my notes that Toney was arrested less than a week after this June -- July 2022 deal happened. No cocaine found in his house. They found fentanyl, and fentanyl is the key drug that the United States of America is fighting right now. Toney was a convicted felon, found a gun. Felons aren't supposed to have guns, subjects you to a long prison sentence.

Now, I want to point something out to you that's really important. It seems that once they found Toney with that fentanyl and that gun, he was willing to do, say, or give up whoever to get what he needed to get, which is less time. You notice that as a part of this, Lanise Briggs, his own wife ended up a felon. He gave her up to help himself.

Let's talk about Arnold Turner. He said he was testifying hoping to get a 50-percent reduction in his time but only if he told the truth. I think he told a lot of truth. He said he'd been dealing drugs since the '80s, said he'd been dealing drugs with Toney for many years, talked about him and Toney going to California couple times trying to chase down some drugs.

Here's the other thing that he told you: He and Kevin

Langel grew up in the same little part of Pine Bluff.  He'd known who Kevin Langel was all his life.  He said Kevin Langel was never there on those California drug runs.  He said that he moved -- he being Mr. Turner, picked up packages, moved drugs for Mr. Toney.  Kevin Langel was never involved in any of that, never picked up any packages from him.  He said he hosted meetings with Toney and some of Toney's suppliers.  Kevin Langel was never there.

I asked him specifically, Kevin Langel have anything to do with Mr. Toney's drug enterprise?  He said no.  He said he'd seen Kevin Langel around Pine Bluff always in a tow truck.  Now, I asked Agent Abbott, why didn't you do a controlled buy on Kevin Langel?  He said he didn't have anybody to send to his house.  Well, that wasn't accurate because he had Arnold Turner, somebody who had known Kevin forever.

Now, let's talk a little bit more about Mr. Toney.  Something else I noticed about Mr. Toney from him and his wife, he was real good at fooling folks.  He and his wife been married a long time.  She said, and I really believe her, that until his arrest, she had no idea he was dealing drugs.  He admitted to lying to investigators.  You heard on those calls that around the time of that July 2022 transaction, he was desperate to find some weed.  He didn't want to look bad because he didn't have weed.  He could not say how much he alleges he gave to Mr. Rogers but thinks it was $13,000, which is very important

because Sergeant Briggs and Agent Abbott told you that a kilo of weed costs $24,000.  Where is the other 11?

Now, it was suggested that maybe --

MR. GIVENS:  I think you just said a kilo of weed.

MR. SMITH:  I'm so sorry.  Thank you.  A kilo of cocaine.  Thank you.  I do appreciate that.  A kilo of cocaine was 22, $24,000, so where is the other $11,000.

Now, the evidence that came in was that whatever allegedly went down between Mr. Rogers and Mr. Toney was short.  You heard on the phone Mr. Toney being pretty terse with Reverend Rogers. "I'm short.  I'm short."  Who, other than J. "Wimpy" Wellington, don't give you all your stuff and then is mad you didn't give them all theirs.  Does it really make sense that if Toney had not paid for all of the drugs, that he would have the audacity to be climbing up Reverend Rogers's butt?  It doesn't make sense.  That amount suggests that this was something other than a kilogram of cocaine because it was far less than $24,000 or $22,000.

Now, the thing that's most important to me is Roderick Toney admitted I don't even know Kevin Langel.  He told you he wanted a time cut.  He could only get it if he told the truth. The truth according to whom?  Mr. Givens, the lawyer for the United States of America.

I want to talk about Lanise Briggs a little bit, Mr. Toney's wife, and I want to talk about her for this key

reason:  She alleges that she was with him when he went to meet Mr. Rogers at this car wash in the dead of summer, July 2022. Again, you can use your life experience.  In Arkansas, what do we wear in July?  Short-sleeve shirts, shorts.  She said that when Mr. Toney came back from meeting Mr. Rogers, he didn't have anything with him.  How is there a deal if there's no product that he got?  Where is the stuff?  Again, where's the dope?

Angela Robinson testified that, yeah, I gave a package to Reverend Rogers, and she knew it was money.  She thought it was for some loan that Roger has made to Toney, some legitimate purpose.

Now, I want to talk a little bit about the other officers who were around that day trailing Reverend Rogers.  Tyler Barber, he told us a lot about surveillance and GPS, and to be honest, I was impressed with it.  It sounded like the stuff we see on TV.  They take turns, you follow for a little bit, I'll follow for a little bit.  He said he saw Rogers at that car wash with Toney, but you know what he didn't say, he didn't say he saw an exchange.

Now, I want you to think about what he said and think about what the other officer said, too.  There was a crew following Rogers that day.  That car wash was just surrounded by the police, and they all had department-issued iPhones.  Why is there not one picture of this meeting?

THE COURTROOM DEPUTY:  Judge, it's not showing on

their screen.

MR. SMITH:  I'm sorry, let me turn this towards you. My little Hot Wheels map of the car wash photograph, Exhibit 8C, surrounded by all the police officers.  Why is there no -- nobody pulled out their iPhone, just took a little snap, shot video.  This would be a whole lot easier for all of us if they had.  Now, Tyler admitted that he never did any surveillance of Kevin Langel -- I'm sorry, Officer Barber.

Next up, it was Detective Stanley.  He said he does surveillance.  He said he was trailing Rogers on July 14, 2022. Now, this is really important.  He said that Rogers went to the doctor, stayed there for a little bit, went in, left.  Nobody knows where he went.  Nobody knows who he met with.  Nobody knows what he may have picked up.  Came back, they did the tracker on his truck, then leaves again.

Rogers also went to Goodwill.  Did he do something something slippery at Goodwill?  We don't know.  Then he passed through Church's.  And my recollection is that visibility on here was lost a little bit at that point.  Did he do something at Church's?  Somebody hand him something?  Did he hand somebody else something?  We don't know.

Now, the testimony from the officer -- and I appreciate this.  Can you guys see that?  You can't see it at all, poor thing.

This is Exhibit 11G.  The officer was parked all the way in

this back corner of a convenience store across the street, and he says that he saw Kevin Langel meeting Mr. Rogers. He saw Mr. Langel pull up on a motorcycle. He saw him get in another vehicle for a bit. He said then he saw him get in Larry Rogers's truck, and they were there for a bit. But you know what he did not say -- he did say because I want to be fair that my client had a backpack on. You can see it in the picture. He never said he saw a handoff. He never said he saw any kind of transaction.

Now, I'm not going to sit here and try to say to you, because that would be disingenuous, two dudes sitting in a truck, they could have done something, they could have exchanged something. Absolutely. Absolutely. But this isn't about what could have happened. It's about what did happen. They then had tacos.

Detective Jeremy F., and I'm not being disrespectful by not saying -- I can't -- I don't want to pronounce it wrong. He was the one with the long European-sounding name that sounded much more fancy than mine. But he said he was there on July 14th. He was also at the car wash when Toney and Rogers allegedly met. He also said he did not see any kind of handoff exchange.

Now, I want to talk about Agent Laster with the DEA. He claims that he interviewed Mr. Rogers in July 2022. He also admitted on cross-examination that there was a DEA policy at the time that these interviews are to be recorded. There is no

recording of whatever Larry Rogers allegedly said to him, but he claims that at one point, Larry said he thought he may have been doing a weed deal and that he believed that there was $10,000 in the bag.  Now, Larry Rogers is semi old dude staring down the United States of America's DEA.  Doesn't have a lawyer present.  You can consider all your life experience.  Sometimes people in those situations they just say whatever they feel like they need to say to go home.

Now, Agent Abbott came back, and he talked about taking Kevin Langel's phone.  Kevin Langel had been arrested.  Again, a year later, he was arrested in the tow truck by Officer Davidson.  This is, again, one year after that alleged July 2022 transaction.  They had been investigating him for a year.  Now, this would have been a lot simpler had they just pulled everybody over in July of 2022.  Is there dope?  Is there money?  We get the answer.  I respect what they said.  They said we didn't pull him over at the time because we wanted to see what else they might do, which makes sense.  So they said that they did that with Mr. Langel.

One year they watched him, and they found him in a tow truck.  They knew exactly where he was in Stuttgart, Arkansas, towing a vehicle, which is his job.  They searched that tow truck.  They found two old Nokia phones, Mr. Langel's phone.  You know and I know that car he was towing, they tore that thing apart, too.  They didn't find any drugs, no money, no scales, no

drug residue.  One year of investigating they found nothing.

Now, Agent Abbott comes back.  He says that they got a warrant, searched Mr. Langel's phone.  Again, they had everything in it, everything.  And what did they find?  A weird selfie that I admit is not very flattering.  They found some WhatsApp messages that could mean a lot of different things.  I do want to pound out that WhatsApp is a web application, like Facebook.  We've all seen people say on Facebook, hey, forget all that, I've been hacked, wasn't me, ignore all that.  Like anything else, WhatsApp could be hacked.

There were numbers there that made Agent Abbott nervous. He said, to him, they indicate drug deals.  But, again, he admitted he wants you to believe that between November and December 2022 into 2023, Kevin Langel is running boxes of cocaine up and down the highway between Houston and Pine Bluff. But they never saw him with it.  They never caught him with it. They never photographed him with it.  They never videoed him with it.  For their theory of this to be true, Kevin Langel has to be the Harry Houdini of drug dealers.

Now, I want to talk a little bit about our defense. There's messages, we don't dispute it, between Kevin Langel and Larry Rogers.  Look at 12B.  It's an address and some cars that looks like Reverend Rogers wanted towed.  Look at 17C, another address, pick-up, drop-off directions.  Then there is something over here.  I want to point this out, and I want to be honest,

May 1st, a message.  He says something about 22.  There is no response.  We don't know what 22 is.

Look at this one, 17I.  7:19, Reverend Rogers allegedly sent Kevin Langel a message, "22,500."  Look what he says after that, "Mistake."  And there's no response from Kevin Langel.

In July, "Call me about a tow."  "Hey, he want a spare tire back," 17J.

We provided testimony from Nisaa Langel.  She talked to you about the family business.  You'll see that in our exhibits.  She said they own a large lot in Pine Bluff.  They have hundreds of salvage cars.  She says she's been married to Kevin for 20 years, Lancam Towing.  They do towing.  They do vehicle repossession, which is very important, because she said that can be messy.  It could be violent, so you want to surveil that, figure out where you're going before you go.  You don't want them to know you are coming, so maybe you park in an odd place like a McDonald's parking lot.

She said that they transport boxes, freight, and other items.  She talked to you about how she finds those deals, brokers, middlemen, some of whom use WhatsApp, some of whom you call, some of whom you text.  She said they buy damaged shipping loads and they resell that stuff.  She also said they deal in high-value metals, like gold and silver.  She talked about the importance of testing that stuff so nobody sells you something fake.  She said they do low-value metals, like copper and

aluminum, aluminum cans.

When we talked about her company, she said they had several trucks, including an 18-wheeler.  They moved packages all over. She lives in Houston.  Kevin lives in Pine Bluff.  It makes a lot of sense if you have a logistics company and you're going from Pine Bluff to Houston to see your wife, see if you can't pick up a load, go to Houston, pick it up, make a little money.

She also said that oftentimes the stuff they buy is in plastic crates.  Here's two of them right here in Exhibit A. Here's some of the salvage cars in Exhibit B.  But I really want to point out all this copper that they have, and this one. They're doing truckloads of those crates all the time.  How you know what's in one of those crates?  How do you know that you had not been -- that they gave you everything they promised? She said they bust it down, bust it open, see what's there. Sometimes you're short.  She said that those numbers in WhatsApp, they could be addresses, house numbers.  They could be anything.

I want to also point out what she said about Larry Rogers, that Larry was Kevin's grandfather's best friend.  They had known him forever and that Larry owned a used car lot and that they did tows for him.  They sold him parts.  He sometimes sold them metal.  Our investigator, Kandis Stoddart, she looked into Lancam, said, yeah, it's a business.  Yeah, they got a location. They got vehicles.  They do towing.  They do logistics.  She

also said that she looked into some of these numbers in the WhatsApp messages, and she said a couple of them were addresses and that one of them was an address right here in North Little Rock.  She said she'd ordered many tows over the years and a key component to that is an address.

Now, ladies and gentlemen of the jury, I want to thank you, again, for your service to this case, for the time you put in. I also do want to apologize again, Agent Abbott; that was abhorrent.  That was not intentional; I'm sorry.  I want to apologize to you and to the Court.

I just want to talk a little bit before I leave about doubt.  Doubt I told you is questions.  Why didn't the officers take pictures or videos of Roderick Toney and Larry Rogers missing -- meeting, excuse me.  If Larry Rogers and Roderick Toney really did a deal, why didn't anyone, including Roderick Toney's wife, see that package?  If a deal was made, was it for weed, like Larry Rogers allegedly said initially?  Did Rogers meet someone at Goodwill or Church's when the agents lost sight of him?  If Kevin Langel really was doing this, moving cocaine, if those boxes had cocaine in it all that time, why are there no recordings of him doing these deals?  Was that even Kevin Langel on the WhatsApp?  If so, did he even ever move the boxes?  Was there really an agreement to move them?

Was boxes a reference to storage units?  We've all seen Storage Wars.  People don't pay their rent on their storage

units and they get sold.  Those could be referred to as boxes, was it a reference to boxes of damaged goods that Nisaa Langel testified that they buy?  Were boxes a reference to any of the items that the Langels sell in their business?  How did Kevin Langel successfully move kilogram quantities of cocaine for months while under investigation of the watchful eye of the DEA?  Why are there no pictures or video of him with money, no drugs, no wiretaps, no GPS tracking?  There are just too many questions.

I want to remind you of one very important thing.  Here you sit in the United States District Court for the United States of America.  We're not in the Pulaski County circuit court.  We're not talking about the North Little Rock PD.  This is the United States of America.  The DEA has offices in every state, including Houston.  They have partnerships with state and local police, billions of dollars at their disposal, planes, helicopters, satellites, Arnold Turner works for them, right down the street for Kevin Langel.  But there is no proof after a year of investigating Mr. Langel beyond speculation about these WhatsApp messages to support that these WhatsApp messages really are about illegal substances.

Ladies and gentlemen, this ain't gumbo.  Gumbo needs a roux.  This ain't a drug conspiracy.  A drug conspiracy needs drugs.  And to convict him, Verdict Form No. 2, you have to be able to say how much it was, and you can't say how much it was,

ladies and gentlemen of the jury, because you don't know what was in the box.

I respectfully ask you to follow the judge's directions. I respectfully ask you to consider the weight of this, to not press upon each other, to not lean upon each other, to reach your individual conclusion collectively. And if you are all not convinced beyond a reasonable doubt to each and every element of this charge, to please find my client not guilty.

If for some reason you can't reach a conclusion because sometimes the answer to the question is, I don't have the answer, let the judge know. That's what he is here for.

Ladies and gentlemen of the jury, you don't know what's in the box. Thank you.

THE COURT: Thank you, Mr. Smith.

Can I see the lawyers up here for a moment?

(Bench conference reported as follows:)

THE COURT: Heather, can I also see you?

Two things: The first thing is, I think that Mr. Smith misstated the rule on reasonable doubt. I am happy to not mention it; and, Mr. Givens, you can do whatever you're going to do with it. Or I'm happy to reinstruct on it right now, quite frankly, generally at the Government's option.

MR. GIVENS: Your Honor, I'll touch on it. It's fine.

THE COURT: Okay. Then I will leave it alone.

Secondly, it is now 12:45. What are we doing about lunch?

Once I send them back, will be they be able to get lunch?

THE COURTROOM DEPUTY:  I have it ready.  I mean, I have the form ready.

THE COURT:  Do they have snacks back there?

THE COURTROOM DEPUTY:  They do.  They do.

THE COURT:  In that case I think we're going to go forward, and you'll be up right now.

MR. GIVENS:  Okay.

(Proceedings continuing in open court.)

THE COURT:  Jury, just so you know, there is a last part of this.  Mr. Givens gets to make a rebuttal.  I have basically five minutes of instructions left for you.  After you go back to retire, first of all, there are snacks back there as you probably know already; but second of all, then we'll take care of your lunch for you.

REBUTTAL ARGUMENT

MR. GIVENS:  Thank you, Your Honor.

Ladies and gentlemen, Bruce Smith wasn't selling marijuana to Roderick Toney.  Larry Rogers knew exactly what he was doing when he was getting kilos of cocaine from Kevin Langel, and Kevin Langel was not moving used cars or boxes or copper when he was obtaining multiple kilos of cocaine from Houston, kilos that he brought back to Arkansas.  What they were all doing is they're all dealing drugs; they were.  Bruce Smith was dealing methamphetamine; Larry Rogers and Kevin Langel are dealing

cocaine.

There are different types of drug dealers for sure, and you have learned a lot about the business of drug dealing over this past six days. They were different types of drug dealers. They were all dealing drugs. Bruce Smith was a source of supply of methamphetamine that was sending it to Arkansas. Kevin Langel was a source of supply of cocaine that he was getting in Texas and bringing it to Arkansas. And Larry Rogers -- yes, Larry Rogers got caught in the middle of this. Make no mistake, Roderick Toney would not have cocaine to sell to his customers without Larry Rogers and Kevin Langel. Larry Rogers in the middle and got the cocaine from Kevin Langel to Roderick Toney.

My goal just so you all know is to be the shortest of the four arguments you've heard so far. I don't want to keep you. We all need lunch at this point, but too many things have been said that I have to address and talk about. And something that one of them said is absolutely true. I think it might have been Mr. Golden, what we say is not evidence. What we are telling you this morning and this afternoon, this is not evidence. Everything that you have just heard, none of that is evidence.

The only evidence came from there, asking you to focus on that. Alternate explanations that you have been given, not evidence. You can absolutely find an alternate explanation for all three of these gentlemen if you look at one specific thing. I'm asking you to take the evidence you've heard in context over

the whole course of this trial.  Looking at everything, from wiretaps, from GPS location on phones and cars, from physical surveillance, from Defendant interviews, from, yes, testimony of coconspirators, look at all of it, and what does all of it tell you, not one individual piece for one individual Defendant, look at all of the evidence you have, and what does it tell you?  Those three men were selling drugs in Arkansas.

Over the past four days you have -- four days of testimony, you've been here for six, but over four days of testimony, you have been asked to digest what the DEA and North Little Rock spent two years gathering for you.  It comes to one conclusion; Mr. Smith was selling meth, Kevin Langel was distributing cocaine, and Larry Rogers was passing that cocaine along.  And they agreed.

I told you I can't just sit down and let you guys get to lunch yet because so many things were said, and frankly, I disagree with a lot of it.  For example, that these officers couldn't take pictures of this meeting between Larry Rogers and Roderick Toney.  What I recall the testimony -- and, again, this is the last time I will say this.  What I recall of the testimony, that is not evidence.  What Mr. Golden, Mr. Tarver, and Mr. Smith recall of the evidence, not evidence -- of the testimony is not the evidence.  What you recall is the evidence.

What I recall is several officers saying they're driving around.  They couldn't take pictures while they're moving at 30

miles an hour down the street, and the type of surveillance they were doing was coming in and out so they wouldn't be seen. That's just an example.

Another big example of why I can't just sit down is, when I hear things, like, you have to have drugs for there to be a drug conspiracy, no, you don't, for one thing.  Please read your instructions.  What is a conspiracy?  An agreement between two or more people to distribute drugs or possess with intent to distribute drugs.  You do not have to have physical drugs for there to be a drug conspiracy.  You have to agree.

So, for example, when Roderick Toney and Bruce Smith agree they were going to get five pounds of methamphetamine in late June of 2022, I submit to you Roderick Toney never got that five pounds of methamphetamine.  He got five ounces, but they agreed there was going to be five pounds.  If that is the only deal that you believe happened, that's a methamphetamine conspiracy of more than 500 grams.  Kevin Langel, I submit to you, he wanted to get six kilograms of cocaine on December 11th of 2022. He got four.  The fact that he didn't get all six, he agreed with Richard Ortiz and the courier that there was going to be six initially.  That's what he asked for.  That was an agreement.  You don't have to have actual drugs.

I also have to talk about Roderick Toney, and he was taking shots everywhere.  And I get it.  He is a drug dealer.  I am not up here to defend a drug dealer by any stretch of the

imagination.  He pled guilty to what he did, and he is a drug dealer.  And I understand why everybody took shots at him, including Mr. Smith, and Roderick Toney doesn't even know who Kevin Langel is.  But Roderick Toney took shots from Kevin Langel's attorney all the same because he is such an easy target because no one is going to defend a drug dealer.  I'd ask you to think about -- we'll get into some of the things he talked about, but I do want you to take into context what was happening with Roderick Toney as well.

Mr. Golden is right.  I don't think Mr. Golden was rude to him.  I do think by the time Mr. Golden was talking to him, he had been up there on that stand for hours, for hours.  Yes, when he left and when he got up, that all matters.  You can look at the demeanor.  You can look at how he was responding.  He was tired.  He was frustrated.  At one point, the most -- I think I heard him say, oh, here we go with the calls again.  He was exhausted at that point, and I submit to you guys, he knew why he was here.  He was here to talk about his methamphetamine deals with Bruce Smith and his cocaine deals with Larry Rogers.  He had no idea about this other issue that he was going to be talking about, about some personal use marijuana deal that happened three and a half years ago.

You heard evidence that these wiretaps -- each call is identified by a session number, so the very first call is Session 1, and it goes up.  When you get back to the jury room,

look at how many session numbers, if you want to look at Exhibit 1, there are.  There's more than 2,000 sessions; that means that in the one month that Roderick Toney wiretap was up, he talked on the phone over 2,000 times, and he is being asked to recall one conversation out of 2,000.

Now, yes, he absolutely recalled a single conversation with Bruce Smith talking about five whole ones or five little-bitty ones because that's why he was here.  That's why he pled guilty. Those calls are what put him in prison.  A call to Sam or Mike or B, that didn't put him in prison.  That was for some marijuana that had nothing to do with this.  Of course he is going to remember the calls with Bruce Smith that led to the DEA kicking in his door and arresting him in the early morning hours of July 20th.  Of course he is going to remember talking to Larry Rogers about the kilo of cocaine that got him put in a federal indictment.  Those are the calls that he had firm grasp on.  It was the calls that had nothing to do with his indictment, I submit to you, it was the random friends that he was speaking with that he had trouble recalling.

He didn't recall specific times of where he was three and a half years ago.  He didn't recall -- when you're asking about the Bruce Smith calls, I don't recall him ever saying a specific time that he remembered for those either or a specific date. And there were times he couldn't put, like, that I got four pounds on April 17th of 2021.  No, he wasn't capturing those

details.  What he remembered and that he was never equivocal on, that he had no doubt, I got meth from Bruce Smith.  It was multiple pounds.  I got it at these apartments off of Stagecoach Road, and I got it between -- in '21, '22.  I paid 12 or 1500 bucks for a pound.  That's what he remembered.  But when pressed on specific dates, specific times, about the friends of his that he thought had nothing to do with methamphetamine, no, he couldn't remember.  Does that mean that he did not get methamphetamine from Bruce Smith?  Absolutely not.

He is hoping to get a sentence reduction; that is absolutely true.  He told you that.  He also knows that there is other consequences for being up there; that's another charge for perjury.  That's getting zero help if he lies.  Now, is he lying about every single thing that he did, that's for you to decide.  That is not for me to tell you anything up here.  All of this credibility of Roderick Toney is for you to decide, but I just ask that, as you make that credibility determination, you would read Instruction 4, consider all the things that the judge has told you can consider, and that includes his ability to have been there to see these things, but also if a mis-recollection or forgetting is about a major detail or a small detail.  That's in the last sentence of Instruction 4.

Roderick Toney remembered the major details.  He remembered and he knew that he got methamphetamine from Bruce Smith, that he got cocaine from Larry Rogers.  Some specifics, and I'm kind

of going to have to go in order kind of how it was presented to you, and that's kind of the way we've been doing it throughout this whole trial, but not -- no one disputes that Roderick Toney is a polydrug distributor.  He sold a lot of different kinds of drugs.  And nobody disputes that Arnold Turner picked up some drugs for him.  Mr. Golden tried to imply that because Arnold Turner only got $200 for that, it must mean that it's marijuana that he was getting.

Remember that call when Roderick Toney called Arnold Turner to ask him?  What's the first thing he said?  "You want to make some money?"  What was Boo Boo's response?  "Always.  Always."  We laughed about that call just because of the inflection on that.  "Frank White, you want to make some money?"  "Always. Always."  Boo Boo didn't care what he was picking up.  He did -- he just wanted to make money.  He wasn't asking, well, if it's marijuana, I want 200.  But if you are going to be picking up methamphetamine, you are going to have to give me 2,000.  Arnold Turner just wanted to make some money.  He was going to go run an errand, go pick something up at a house.  When you are a drug dealer, that's what you do.

I would assume -- Mr. Golden said -- talked about his friend.  I'm assuming that none of Mr. Golden's friends are drug dealers, and Arnold Turner is.  He would absolutely take $200 to go pick up a package of anything.  It's important to remember Agent Abbott's testimony the second time he came around.  He

told you when Ms. Fields was asking about prices of marijuana, he testified that marijuana is 300 bucks a pound.  About $300 a pound you can get that.

Would Roderick Toney, a guy who testified that he's been involved in hundreds of pounds of marijuana need to get an out-of-state seller from California to get five pounds of marijuana?  Those calls that Mr. Golden played for you, Roderick Toney had sources of supply right in Little Rock, not just people for marijuana, right there in Little Rock, right down the street.  And not just sources of supply, these are friends of his.  He can get marijuana from his friends in Little Rock.  He testified that he can get it down the street.  There is no way a person who is used to dealing in hundreds of pounds of marijuana would be contacting somebody from California and making all the arrangements that he made to get five pounds of marijuana.

For just that one deal, we played you probably, like, 15, 20 different calls or text messages trying to set up one deal for five pounds of marijuana because five pounds of marijuana, that's six, $8,000.  But for $1,500 -- five pounds of methamphetamine is six or $8,000.  Lots of logistics go into that.  Would he be doing that for $1,500 worth of marijuana when he can get it down the street?  He wouldn't.

In those calls you heard, limoncello or cherry gelato, there's all that talk about what kind of marijuana there was. Did you hear any of that talk in the Bruce Smith calls?

Marijuana has got flavors, lots of different strains, lots of different strands, like you heard in that call.  Meth is meth. He didn't have to ask what kind of meth.  He wanted five; that's five pounds of meth.  Roderick Toney was very clear when he testified that he was getting marijuana from people here.  He was interested in hundreds of pounds of marijuana from Bruce Smith; that's why he flew out to California to look at his grow operation, but it never panned out.

So let's talk about some of the things that were -- that you can look at beyond Roderick Toney's testimony to show what he was saying was corroborated.  Arnold Turner said the same thing, right?  They never got marijuana out there.  I can understand going out to California for hundreds of pounds.  I can't understand him continuing that business for five pounds.

They didn't talk prices because they met face-to-face. Several different -- between agents, officers, and drug dealers all told you, we don't talk about specifics on the phone.  And why would they?  They don't talk about that because they don't want what happened here.  They don't want those calls played before you guys or juries.  Those calls involving B or Mike or whomever, they probably were about marijuana, but you have details that tell you that.  Nothing about the interaction between Roderick Toney and Bruce Smith indicate to you that he was just another source of marijuana that happened to live across the country.  He was a methamphetamine source of supply,

and that is what Roderick Toney was buying.

I'm not going to play these calls, but "Did somebody get a misunderstanding?  That's exactly what that was.  You know I don't even do littles like that."  "I know.  Let me" -- Bruce Smith says, "Let me put it back together, Bro."  Guess what that is, that's an agreement. I submit to you that it was absolutely for methamphetamine, okay?  Now, that -- with the -- if you accept that, that's an agreement for methamphetamine.  It doesn't matter what -- but Roderick Toney asked for five pounds, Bruce Smith said I'm going to put that all together for you.  That's a conspiracy.

Mr. Golden talked about Roderick Toney being -- I'm sorry, Bruce Smith being a homebody, never leaving.  So, therefore, I guess the implication is nobody could ever bring him methamphetamine, he could never get meth because he never leaves.  A couple things about that:  One, keep in mind that the testimony about this exhibit, which is 5E, was that this is over 30 days of the GPS ping.  Those are 15-minute increments.

Yeah, our suggestion is that he was sleeping at that Mesquite address, just like Roderick Toney and Arnold Turner told you that.  So could he have ever left?  We know for a fact that he did, right?  We know from 5A he went up and down the East Coast.  We know he went to Chicago.  He was in Dallas.  Here is he in California.  And, yeah, we know he was in Arkansas, too.  He wasn't just a homebody.  He was a drug dealer

going around the country, and this is just in a 30-day period of time.  That's a lot of traveling for a homebody in 30 days.

Last thing I want to say about Bruce Smith is, there was some discussion about his interview that he provided in two or three, four, five.  I asked do you remember -- you guys, I know some people have been flipping pages constantly.  Go through your notes.  My recollection of Roderick Toney's testimony was that he would get whatever Bruce Smith had at the time. Sometimes it was four or five.  Sometimes it was two or three. None of that matters for -- the exact amount does not matter for a drug conspiracy or this charge, unless you believe that he got less than 500 grams.  Two pounds is more than 500 grams.

Roderick Toney, they tried to pin him down.  Mr. Golden tied to pin him down specifically how many times, how much exactly.  He said whatever Bruce Smith had.  He didn't know exactly how many times, exactly how much.  What is crystal clear from the testimony is it was more than two pounds and it was multiple times.  And the final time was when Arnold Turner picked up a package that wasn't soft, like what marijuana would be if it was in a package.  He didn't know what was in it.  He did know that that package wasn't soft, like marijuana would be if it was in that package.  That was a package of five ounces of methamphetamine.  It was supposed to be five pounds, and it came from Bruce Smith.

Larry Rogers is an interesting situation because I think

one of the first things I might have asked Roderick Toney about, how does -- how does a preacher get involved in cocaine?  Don't know.  But that's not an element of the crime, right?  Why people get involved in drug sales, I don't know.  But what I do know is that Larry Rogers admitted that he did.  One of your jobs back in the jury room is not to try to figure out why he sold Roderick Toney a kilo of cocaine, or if it was even sold at all.  Your job is to determine whether he was involved in a conspiracy to distribute cocaine or possession with intent to distribute cocaine.  Mr. Rogers, it's incredibly clear with Mr. Rogers that he was, and he admitted it.

And the interview, it's not the policy that you ought to record these back at the time.  It was that you give them the option.  They had the capability.  It was Larry Rogers who didn't want that interview recorded.  Josh Laster was very clear about that interview with Larry Rogers.  They were talking about cocaine.  Larry Rogers confirmed, yes, I gave cocaine to Roderick Toney.  He confirmed the pricing, the 24,500 was for cocaine.  Larry knew what he was doing and what his -- but you don't have to -- just like you don't have to believe just Roderick Toney to know that Bruce Smith was involved in methamphetamine because you had the -- you had Arnold Turner and you had law enforcement saw him out in Arkansas corroborating what Roderick Toney said.  You don't have to just believe Larry Rogers's interview and his admission that he sold cocaine or

that he distributed cocaine.  You have all of the law enforcement surveillance and all the physical surveillance.

Let's talk for a moment about the law enforcement officers in this case.  Sergeant Briggs testified he has 19 years of experience; Agent Laster, 21 years; Agent Abbott, 26 years of experience doing these kind of things.  They did testify -- and you can consider all of this in your consideration of credibility, but there's 60 years of law enforcement experience just from those three individuals right there.  They've seen these deals happen before.  They know what these text messages mean, and what they saw is exactly what Larry Rogers says he did.  That evidence is -- the evidence of Larry Rogers -- Larry Rogers's interview, law enforcement surveillance, it all corroborates each other, which brings me -- I do want to take a moment and talk about the wives in this case because that was some of the most interesting testimony.

You had Lanise Briggs, Roderick Toney's wife; you had Nisaa Langel, Kevin Langel's wife; and those are both strong, intelligent women.  And they had something else that was in common, they both were absolutely trying to protect somebody.  Now, different people, Ms. Langel is obviously trying to protect her husband.  We'll get to that.  But Lanise Briggs, Lanise Briggs was trying to protect herself, that's who she was trying to protect.  She was trying to distance herself as much as she could from any involvement in drug dealing.  You guys can

consider all of the reasons for that on your own, but she absolutely didn't want to be connected to his business at all, and she was very clear about that.

When you were sitting in the driver's side, in the driver's seat of your Escalade when he picked up cocaine, did you see him bring cocaine in the -- no, I didn't see that.  She said, no, I didn't see that.  The only thing that she couldn't get away from is all those text messages because there's proof of that beyond just her testimony.  So everything that there wasn't a message for, she didn't know anything about what Roderick Toney was doing, but because we had those text messages, she couldn't get away from everything, so she told you about that.  She said, yes, I know that he was trying to make a drug deal that day.  Yes, we sent money.  And, yes, we were at the car wash; all of that was corroborated by what the officers saw.

I don't recall Roderick Toney saying that Larry Rogers pressured him as much as kept on -- kept on calling him about it, right?  What's that Roderick said, that he didn't -- the other thing -- that he didn't -- he wasn't involved in cocaine.  I think Mr. Tarver said to you at one point that Roderick Toney said he was only involved in marijuana, not cocaine, or maybe it was -- I don't remember who, but my recollection, he didn't say I was only involved with marijuana.  He said, "I wasn't involved in cocaine that much."  He was a meth dealer, a marijuana dealer.  He wasn't really involved with cocaine until Mr. Rogers

asked him about it.

But I want you to look at -- these are the messages between Roderick Toney and Larry Rogers. Roderick Toney on July 7th sent him a message. The next time that they talked was July 12th. He says, "Maybe one out of two, 24,500." It was Larry Rogers reaching out to Roderick Toney about this. It wasn't the other way around. Of course he would because Roderick Toney is the guy that's the drug dealer that's got the -- Roderick Toney would not have been involved in cocaine if it was not for Larry Rogers.

Again, some of the things that Mr. Tarver said was how Mr. Toney had perfect recall about his dealings with Larry Rogers but not about other things, and it's the same thing as I suggest to you with Bruce Smith. Larry Rogers does not remember -- I'm sorry, Roderick Toney does not remember Larry Rogers praying over him for his back surgery because that had nothing to do with why he was sitting in that chair. But he did remember him talking about cocaine because that's why he was here.

Mr. Tarver was concerned about why they put the tracker on Larry Rogers and why they were following Larry Rogers and not Roderick Toney, who was the focus of the investigation. Remember, at this time, for one thing, Roderick Toney had a wiretap on his phone. They knew exactly what he was saying and doing this whole time. Two, they knew that Roderick Toney was

going out of town, so what would putting a tracker on his vehicle do?  But, most importantly, three, all those messages, it was clear that it was Larry Rogers who was getting cocaine from a source of supply and giving it to Roderick Toney.

Why would you follow around Roderick Toney while he just sits around and waits for the cocaine to come to him?  You're going to want to follow around the person that's getting the cocaine to figure out who he's getting it from; that's why they were following Larry Rogers.  They knew what Roderick Toney was going to be doing.  He was going to be waiting around at his house until Larry Rogers told him I got the cocaine, but they wanted to follow Larry to see where the cocaine was coming from, and they found that.  It was coming from a taco stand on Geyer Springs, given to him by Kevin Langel.

The fact that Larry Rogers didn't know how many ounces are in a brick of cocaine in no way means he did not distribute a brick of cocaine to Roderick Toney.  There's been no evidence or testimony to suggest that Larry Rogers was anywhere near the sophisticated drug dealer that Roderick Toney was or that Kevin Langel was.  That's why I told you, these are very different types of drug dealers.  And you've learned at this point there's all types.  Larry Rogers did not know these prices because Kevin Langel was saying the prices, and he was passing on -- Roderick Toney is the drug dealer who is going to sell it.  He couldn't have sold it unless Larry Rogers gave it to him.

Motives do not matter and are not an element for you to consider when you go back to the jury room for Mr. Rogers. I don't know why he wanted to middleman, a couple kilogram deals with Roderick Toney and Kevin Langel. It's not an element. What is important is that he did it and that he agreed, first, with Kevin Langel to get the cocaine, the person he's known for a long time, then he agreed to give that cocaine to Roderick Toney. And you know it was a kilogram on July 14th. It was a kilogram on June 30th; that's more than 500 grams. Roderick Toney told you, the price is 24,500, I only gave him about 13,000 the first time. I was supposed to give him the rest later. That's the evidence that you have. Why he didn't give all 24,500 initially is not before you. What is before you, what Roderick Toney said was I had 13, I was going to give him the rest later.

Look at how many texts and calls are between Larry Rogers and Roderick Toney suggests that Larry Rogers did not know what was happening is not reasonable, even less so when considering he told the police exactly what he did. So we know what -- we know Bruce Smith sold methamphetamine. We know that Larry Rogers passed along kilos of cocaine. Where did Larry Rogers get that cocaine, he got it from Kevin Langel.

"He's in Houston today, Mr. Toney." How about the day that the transaction is occurring or the day before, July 13th? "They're on the other side of Texarkana." "It's going to be

later than I thought."  That cocaine was coming from Houston or Texas, and it was coming from Kevin Langel.

Mr. Smith -- now, when I'm saying -- just for the record, I'm done talking about Bruce Smith, so if I say Mr. Smith, I'm referring to Mr. Langel's attorney at this point because we're going to talk about some of the things that he said.  First thing I'd like to bring your attention, he had -- Mr. Smith had a box.  He made much talk about boxes throughout his presentation to you.  I'm going to ask you to go back and look at Exhibits 15A and 15B.  I think there's maybe a mention of a box one time toward the end.  That's not how -- I submit it was a box of cocaine, but to suggest that this whole talk is over boxes, I would ask you to look at the exhibits to determine if you believe that to be the case.  I think the majority of the talk was just like the talk that you saw between Bruce Smith and Larry Rogers.

Numbers without context, an individual -- numbers without -- why is there no context, because drug dealers aren't going to talk about the actual product on the phone or in messages.  So for you guys to understand what the drug is, you have to look at the entire series of messages; that's how you get context.  You give me one message, I can give you ten explanations of what that one message means, 18,200, it's the first part of a street address, it's the price for a used car, it is the address for being towed, it's the number of copper

poles that I want to buy.  You give me one number, I will give you ten explanations of what that is.  You put that one number in a string of text messages, in this string of text messages, WhatsApp messages, that is cocaine, a kilogram of cocaine.

Mr. Langel's attorney, Mr. Smith, made much talk about there is no pictures of drugs in his phone.  Well, first of all, there's no pictures of drugs -- first of all, there is no evidence that drug dealers would want to take pictures of drugs any more than there's evidence they want to talk about drugs on their wiretap.  So, of course, he's not going to have pictures of drugs in his phone.  Kilogram-level dealers aren't going to carry around scales or baggies either, but to suggest that the DEA was investigating him for this over a year and found no evidence of his drug dealing, I'd ask you to consider something else.

Agent Abbott told you he was declared a fugitive.  They were not investigating Kevin Langel for over a year after this drug deal.  They couldn't find him.  Now, I think it was probably because there's been evidence that he was going back and forth between Pine Bluff and Houston, so they might not have been able to lay him down.  They're not looking for him constantly, but they were not looking to try to make controlled buys from him or put surveillance on him or do this for over a year.  He was a fugitive.  They had to go out there and find him in July of 2023.  And that one day, yes, that one day in July, I

think it was July 18th of 2023, when he was arrested, he didn't have drugs in his car. I don't think that proves in any way he was not a kilogram-level cocaine dealer.

How do we know that he was dealing cocaine? Let's get that out of the way. That's very easy, because of the prices that were in there. Agent Abbott, who actually worked in Houston, Texas, as a DEA agent in Corpus Christi, he knows the prices that people were selling cocaine for. $18,200 is the price of a kilo of cocaine. When you look at that -- going back to my context, look at that price and look at what was being sold in Arkansas for 22 or $24,500. Kevin Langel was getting it from his supplier for $18,200. He was selling it to Larry Rogers for $24,500. That is exactly how drug dealers work and operate.

We know that it was cocaine because Larry Rogers told us that he got cocaine that he gave to Roderick Toney. Based on his phone and all the contact, we know that Larry Rogers got cocaine, and surveillance. We got cocaine from Kevin Langel. Kevin Langel then is talking the same prices to his suppliers in Texas. In context, it's clear that it was cocaine. No, there were no words like elbow. If you recall the testimony, elbow meant marijuana for one thing. Elbow had nothing to do with cocaine, but there was no words like that in those text messages because that's not how drug dealers talk. How do they talk and how do we know that these aren't street addresses, these are just some of the -- you have -- you will have all of these back

there.  Rogers to Toney, "24,500."  Rogers to Lanise Briggs, "24,500."  Here is Rogers and Langel, "30 for one."  $30,000 for one kilo.  No, $28,000 for one.  They say, "It's 22,000."  "22,500, mistake."

Then you go down to sources of supply, Richard Ortiz in blue and Kevin Langel in green.  "It will be $18,200, $72,800."  "This will consist of five.  Let me know if those are for 19,000."  All these drug dealers are talking the exact same way, using numbers because they know what they're talking about.  You know what you do when you use addresses, you do this:  Here is Kevin Langel giving an address 822 Pratt Road; or here is Kevin Langel giving addresses, 15315 North Freeway; or the full address, 2003 Wagon Gap Trail, Houston, Texas, with a zip code.  So Kevin Langel knows how to give addresses.  These other numbers, these are prices for kilos of cocaine.

I'm going to talk briefly about the transaction that he did on December 11th, but if you remember, he thought he was going to get six, then it became five, then there's some dispute because he was, like, "I thought I'm getting five, but I only got four."  He had to wait around a while to see if he was going to get that additional kilo, but he got four kilos.  I submit he got four kilos that day, four kilos at $18,200.  Don't take my word for it.  Go back and do the math.  Do you know what 72,800 divided by four is?  72,800 divided by four is 18,200.  Kevin Langel was buying four kilograms of cocaine at $18,200 for a

total of $72,800.

Agent Abbott went through all those text messages and broke down each individual one, what they meant in his 26 years of experience. I am going to synthesize for you now and tell you what happened in those text messages. Again, this is what I say happened. You depend on your evidence and your recollection.

Kevin Langel asked Richard Ortiz, do you have five or six kilos of cocaine. Richard Ortiz said his courier would get it to him. They had a discussion about how to communicate with the courier on WhatsApp, then they submitted some authentication that I will get into. On December 11th and December 12th, Kevin Langel then met with the courier that Richard Ortiz sent to meet him. They met near McDonald's. He got -- thought he was getting five kilos, he got four. The courier left. Kevin Langel looked and said, you know what, I didn't get all I was supposed to get. He called his source, Richard Ortiz, and said I didn't get it all. That source was concerned, said don't let him leave thinking he gave you five when it was only four because that's $18,200 we have to account for. So wait around, try to get ahold of him. He never was able to, and so he left. That's what happened in that deal. Then later, they kept on trying to -- they kept on communicating to get more cocaine throughout that month.

To suggest that these are work-related WhatsApp messages -- and, actually, I'm not sure. I guess he was either hacked and

these aren't him at all or these are all work related talking about boxes. I submit that neither is accurate, that these are actually a drug deal. It's not just -- this is high-level drug dealing. On that day, December 11th, as soon as that Richard Ortiz found out that Langel wanted to get drugs, he sent him a picture of a dollar bill. It could have been a picture of an apple or a basketball ball. It doesn't matter. But when that courier was ready to deal with Kevin Langel, what's the first message in Exhibit 15B, the very first message that courier sent was the word "pic." And as soon as he said pic, what did Kevin Langel do, he sent the picture that Richard Ortiz sent him. This is the drug dealer's way of multifactor identification. Now they know we're not dealing with police, we can deal with them.

"I'm sure. Has WhatsApp. That's how everybody works." "He's using WhatsApp; that's why I'm going to call him." Here's, "Was it five or six?" Later, "No answer." "Call him through a normal call." "That's not wise." Are these tow company messages? What would be wrong with calling legitimate business people through a normal call? Why would it not be wise? Again, is it reasonable to suggest that this has anything to do with Lancam Towing?

"What are you in?" "Bike." That was during that transaction where Mr. Langel got four kilograms. What else do we know he was doing a cocaine transaction on a bike? On July

14th, when he was meeting with Larry Rogers, he's not doing business on a motorcycle.  Well, you can do business on a motorcycle.  You can't do tow business a motorcycle.

These calls:  "Come to McDonald's.  Easier to blend in." "Can't wait too long.  I'm a sitting duck."  "He hasn't called back yet.  I'm still posted in the strip club."  You know, at one point, the argument was that you want to blend in because you're going to repo cars and you don't want to stand out, but on the other hand -- but the other example was for a sitting duck, you want -- you'd be a 53-foot trailer on the side of the road, so you're standing out and you don't want to be putting yourself in danger.  So I don't know how these relate to work.

Similar with testing, are we testing precious metals, but the other time, busting open the boxes, that was scrap in those boxes.  So Mr. Smith suggested he was busting open these big boxes of scrap, but the testing is related to precious metals, but the testing and the busting open the boxes was in the same text message.  "I'm going to bust open the others.  The amount missing must be from the testing."

"There's four in Dallas.  Do you want to get them in Houston?  The ones in Dallas are hitting 98."  There's been -- that's one -- that's one text we didn't get an explanation for, hitting 98.  Well, at least an explanation from someone other than Agent Abbott who told you that hitting 98 meant the purity level of cocaine.

These messages are not having anything to do with Lancam Towing, and I told you Ms. Langel, who got up there on the stand and told you all about their business, very competently, in a very competent way, she was asked about all these different things that you can look at for one explanation from one text message. Never did you ask -- never was it looked at in the context of this entire thread. That's what I'm asking you to do throughout this entire case. There are other explanations, but not when you look at all of the evidence before you. And I don't envy your task because there is a lot of evidence, but it is clear that the evidence points to one conclusion, and you don't have to just take Roderick Toney's word for it. I ask that you consider everything.

When you do consider everything in the totality of this trial, it is clear that Bruce Smith agreed to sell more than 500 grams of methamphetamine with another person. It is clear that Larry Rogers agreed to distribute more than 500 grams of cocaine to at least one other person, and it's very clear that Kevin Langel agreed to distribute more than five kilograms of cocaine to another person.

I join everybody in thanking you for your attention. It's been a lot. The case is now yours. I ask that you find the verdict that the evidence requires, all three men are guilty. Thank you.

THE COURT: Okay. Members of the jury, as promised,

just a couple of words and last instructions.

In conducting your deliberations and returning your verdicts, there are certain rules you must follow.  I will list those rules for you now.

First:  When you go to the jury room, you must select one of your members as your foreperson; that person will preside over your discussions and speak for you here in court.  Let me just put a notation there.  The first thing you do is you should wait.  Wait about five minutes for Heather to bring back the exhibit books and also to bring back a copy of the instructions and then the verdict forms.  But after that, do what I said in terms of selecting a foreperson.

Second:  It is your duty as jurors to discuss the case with one another in the jury room.  You should try to reach agreement if you can do so without violence to individual judgment because a verdict, whether guilty or not guilty, must be unanimous.  And if you get there, answers to any follow-up questions on the verdict forms must always be unanimous.  Each of you must make your own conscientious decision but only after you have considered all of the evidence, discussed it fully with your fellow jurors, and listened to the views of your fellow jurors.  Do not be afraid to change your opinions if discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right or simply to reach a verdict.

Third:  If a particular Defendant is found guilty of the charge against that particular Defendant, the sentence to be imposed is my responsibility.  You may not consider punishment in any way in deciding whether the Government has proved its case beyond a reasonable doubt against a particular Defendant.

Fourth:  If you need to communicate with me during your deliberations, you may send a note to me through the Court Security Officer signed by one or more jurors.  I will respond as soon as possible either in writing or orally in open court. Remember that you should not tell anyone, including me, how your votes stand numerically.

Fifth:  Your verdicts and any questions you may answer on any of the verdict forms must be based solely on the evidence and on the law that I have given you in my instructions.  Again, the verdicts, whether guilty or not guilty, must be unanimous; and if you get there, answers to any follow-up questions on the verdict forms must also be unanimous.  Nothing I have said or done is intended to suggest what your verdicts should be; that is entirely for you to decide.

Sixth:  Remember, you must give separate consideration to the evidence about each individual Defendant.  Each Defendant is entitled to be treated separately and you must return a separate verdict for each Defendant.

Finally, the verdict forms are simply the written notice of the decision you reach in this case.  The forms read as follows:

Verdict Form No. 1 has the caption.  You'll see it on all three verdict forms, so I'm not going to repeat that.  It has the caption of the case, then it says "Verdict Form No. 1" on it.  Then it says, "On the charge of conspiracy to distribute a mixture or substance containing a detectable amount of methamphetamine, as set forth in Count 1 of the indictment and as explained in Court's Closing Instruction No. 8, we, the Jury, unanimously find the Defendant Bruce Smith" -- then it has a blank line.  Underneath it says, "guilty or not guilty."  You will write whatever you decide on that blank line.

Then there is a note, "If you find the Defendant guilty, you must answer the question beginning on Page 2 of this verdict form.  If you find the Defendant not guilty, you should not answer that question.  But in either event, you must still sign the verdict form on Page 2."

Page 2 of the verdict form has the following follow-up question:  "Question 1, the quantity of a mixture or substance containing a detectable amount of methamphetamine involved in the conspiracy as a result of his conduct and the conduct of other conspirators known or reasonably foreseeable to him was" -- and then it has a blank under both A, B, and C.

A reads, blank, "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine."

Or B, blank, "50 grams or more but less than 500 grams of a mixture or substance containing a detectable amount of

methamphetamine."

Or C, blank, "less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine."

Then it tells you, "Check the quantity of a mixture or substance containing a detectable amount of methamphetamine which the jury agrees unanimously and beyond a reasonable doubt was involved in the conspiracy offense and attributable to Mr. Bruce Smith under Court's Closing Instruction No. 8.  If you are unable to unanimously agree beyond a reasonable doubt on the amount category, check C."  Then it has a place for the foreperson to sign and a place for the date.  That is Verdict Form No. 1.

Then we go to Verdict Form No. 2.  I've already told you the top of the verdict form, but this verdict form reads, "On the charge of conspiracy to distribute a mixture or substance containing a detectable amount of cocaine as set forth in Count 2 of the indictment and as explained in Court's Closing Instruction No. 9, we, the Jury, unanimously find the Defendant, Kevin Langel" -- and then there is a blank with underneath a space for guilty or not guilty.  You write whichever one you make the determination of in the blank, and then it has a note.  "If you find the Defendant guilty, you must answer the question beginning on Page 2 of this verdict form.  If you find the Defendant not guilty, you should not answer that question.  But in either event, you must still sign the verdict form on Page

2."

I'm going to get to the follow-up question in a second, but I want you to understand it's very important that you look at the actual name of the Defendant to make sure you know, especially for the alleged cocaine conspiracy because there are two people there, meaning two codefendants there, which person you're actually looking at, so it's really important you read the name.

In terms of the follow-up question, "Question 1, the quantity of a mixture or substance containing a detectable amount of cocaine involved in the conspiracy attributable to Mr. Langel as a result of his own conduct and the conduct of other conspirators known or reasonably foreseeable to him was" -- then it has A, B, and C with three blanks. Now, again, I want you to notice here the numbers here. The amounts are different from the amounts in Count 1, which was the meth conspiracy alleged. So just make sure you pay attention to the actual numbers here, the quantity of drugs.

A, blank, "five kilograms or more of a mixture or substance containing a detectable amount of cocaine."

Or, B, blank, "500 grams or more but less than five kilograms of a mixture or substance containing a detectable amount of cocaine."

Or C, blank, "less than 500 grams of a mixture or substance containing a detectable amount of cocaine."

"Check the quantity of a mixture or substance containing a detectable amount of cocaine which the jury agrees unanimously and beyond a reasonable doubt was involved in the conspiracy offense and attributable to Mr. Kevin Langel under Court's Closing Instruction No. 9.  If you are unable to unanimously agree beyond a reasonable doubt on the amount category, check C."

Finally, Verdict Form 3.  Again, similar caption.  "On the charge of conspiracy to distribute a mixture or substance containing a detectable amount of cocaine as set forth in Count 2 of the indictment and as explained in Court's Closing Instruction No. 10, we, the Jury, unanimously find the Defendant, Larry Rogers" -- then there is a blank.  Again, guilty or not guilty under it along with -- well, you would write whatever you find, guilty or not guilty in that blank on top of it, then there is the same note or a similar note.  "If you find the Defendant guilty, you must answer the question beginning on Page 2 of this verdict form.  If you find the Defendant not guilty, you should not answer that question.  But in either event, you must still sign the verdict form on Page 2."

Then we go to Page 2 of Verdict Form 3.  "Question 1, the quantity of a mixture or substance containing a detectable amount of cocaine involved in the conspiracy attributable to Mr. Rogers as a result of his own conduct and conduct of other

conspirators, known or reasonably foreseeable to him, was" --

A, blank, "500 grams or more of a mixture or substance containing a detectable amount of cocaine."

Or B, blank, "less than 500 grams of a mixture or substance containing a detectable amount of cocaine."

"Check the amount of substance containing a detectable amount of cocaine which the jury agrees unanimously and beyond a reasonable doubt was involved in the conspiracy offense and attributable to Mr. Larry Rogers under Court's Closing Instruction No. 10.  If you are unable to unanimously agree beyond a reasonable doubt on the amount of category, check B."

Here, of course, you will notice there are only two choices as opposed to three choices, and that is dependent on what the Government charged or is alleged in the indictment.

You will take these forms to the jury room, or actually more aptly, they be provided to you back in the jury room.  When each of you have agreed on the verdicts, your foreperson will fill in the forms, sign and date them, and advise the Court Security Officer that you are ready to return to the courtroom.

Heather, can you please swear in the bailiff?

THE COURTROOM DEPUTY:  Sure.

(Court Security Officer sworn.)

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Now, there is a separate set of rules for the alternates, so I am going to ask the alternates to stay

here.  Stay behind while the jury retires.  But, jury, you are all now excused to deliberate, and you can take your pads with you at this time.

(Jury exits.)

THE COURT:  Okay.  Everybody be seated.

Alternates, this is going to be a little bit frustrating for you, but that's just the nature of the beast.  So one of my law clerks, Steven, is going to take you down to a different room where you may all sit.  Now, you have different rules.

You may not talk about the case with each other.  If we need you, we will swap you into the jury, and then you will begin deliberations with the jury again, but for right now, you cannot talk about the case with anybody else or with each other.  So one thing I'm going to do is ask you to keep your notepads here.  We will maintain them in secrecy from everybody, including us, in case you start -- you need to be swapped in.

For now, you should understand you are allowed to talk to each about the weather, about the sports, about the Olympics, about anything else, but you may not talk about the case.  You should also know that I believe there are reading materials down there for you to use as well.  Steven is going to take you all down there.

Heather, what are we doing for the alternates for lunch?  Do they get the same?

THE COURTROOM DEPUTY:  They do.

THE COURT:  We should be by fairly soon to get your lunch order, but please don't leave that room.

Heather, if they need to leave that room for any reason how does that work?

THE COURTROOM DEPUTY:  They can just let Brandy know.

THE COURT:  If you need to leave that room, just let Brandy know who is our --

THE COURTROOM DEPUTY:  Jury admin.

THE COURT:  -- jury admin folks, but otherwise just sit there and wait for us.  Thank you.

(Alternates exit.)

THE COURT:  Everybody be seated, please.

Couple of things:  First, Mr. Smith, not Mr. Bruce Smith, Mr. Sylvester Smith, it is my intention under Rule 42 of the Federal Rules of Criminal Procedure -- and I am talking about 42(b), summary disposition, to find you in contempt of court in the same way if you had used curse words or if you had used a racial epithet or you had used a sex-based epithet or if you had used a religious-based epithet.  What you said about the Government's representative, not just a witness on the stand, but the Government's representative was outrageous and an affront and an obstruction to the administration of justice going well beyond misbehavior.

I do not believe for a second that it was not intentional. I believe 100 percent it was intentional, and even more so when

I asked you to clean it up and instructed you to clean it up and I instructed you what to do.  Instead of following those instructions, you started to explain what you meant by the term, which compounded the problem.  Before I hold you in summary contempt, I'm happy to listen to any explanation you want to give.

MR. SMITH:  Your Honor, it was -- I understand how the Court has interpreted that.  It was not intentional.  If you think back to the moment, I was kind of thinking about what to say, and I used the wrong analogy.  Being a southern country guy, that's an analogy we use a lot, but it was not intentional.

My father -- and I was just telling this to Agent Abbott -- led the drug force in Camden for many years, so I have great respect for law enforcement.

THE COURT:  I don't think you actually thought it.  I just thought you thought it would play well in front of the jury.

MR. SMITH:  No, Your Honor.  I didn't give thought to that.  It was something that just kind of -- again, I was not appropriately mindful about what I said.  I will say this to the Court, I had -- I was awoken at 1:00 a.m. with a bat in my house that I was chasing, so I had limited sleep last night.  I am just being transparent.  It was not intentional, Your Honor.  I have tried to not alienate anybody.

And I want to also be clear, things like that, Judge, turn

off jurors, so it was not my intent.  It was a Freudian slip based upon, again, being a southern country boy.  That's a colloquialism we say a lot when you're trying to tie somebody down and they're not being tied down.  But it was not intentional.  I was not trying to insult Agent Abbott, and I would never insult law enforcement anywhere, most certainly not in a federal courtroom, Your Honor.

So I understand and I respect the Court has a job of findings of fact, but it was not intentional.  And I wasn't trying to avoid the Court's directive to apologize.  I was trying to apologize, but I understand the Court's --

THE COURT:  By explaining what you meant?

MR. SMITH:  My recollection, Judge --

THE COURT:  That he was slippery?

MR. SMITH:  The first thing I thought I said was I was sorry.  And I apologized to the jury.  I apologized to him.  If the Court recalls, I believe I apologized three times.  And I just apologized again.  I was not trying to do that intentionally, Judge.  I would never do that anywhere, anywhere on Earth, insult a law enforcement officer.  I've never done that in my life, and I would not do it intentionally.  I recognize that it was insulting, and it was offensive.

THE COURT:  I guess what I don't understand is how do you do something like that unintentionally.  Look, I acknowledge that while, as you said -- and you used these words, and I agree

1175

with them.  It was abhorrent.  I acknowledge it was not at the level of the "N" word or the "B" word compared to a woman.  We're in the similar ballpark, but we're not in the exact same address.  I acknowledge that.

Having said that, what if somebody were to say, oh, sorry, my use of the "N" word or "B" word was not intentional.  It just slipped out?  I wouldn't accept that as an answer from anybody.

MR. SMITH:  I wouldn't expect you to, Judge.  But in 2026, I can't think of the -- I don't know of anybody I've heard refer to a law enforcement officer as that term.  That's not a term that anybody that I know uses in this time.

Again, I recognize the storied connotation, but I will say this, Judge, and I think I could find it, I've said that about myself at a legislative committee that was recorded, that I was the greasiest pig at the state capitol.  But I was just making an analogy to a chairman.  He was not going to tie me down to something.  I should not have said that, Judge.  I'm not trying to suggest it was appropriate, but it was not intentional.

To be frank, Judge, that I think turns jurors off.  There is no benefit to me to do that.  I was on a roll.  I think I was connecting with jurors, and I set myself back with that.  I would never have done that intentionally, Judge.

THE COURT:  Does anybody else wish to be heard on this?  Mr. Givens?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith, I'm going to find you in contempt under 42(b).  I do not accept your explanation.  I believe it was intentional.  I also believe that instead of doing exactly what I asked -- and somebody will be able to read the record and see if I am right or wrong, but instead of doing what I asked in terms of apologizing, you did apologize, you did not do the rest of what I asked, which is to tell the jury that it was unacceptable until well later.  And, instead, you tried to explain, and by your explanation, you made it worse.

I think you did it intentionally.  I think it was extraordinarily prejudicial, not just because it was a witness but because it was the representative of the United States Government who has sat in here the entire time and the jury has gotten to know.  Again, we're in the same neighborhood but not the exact same address as the epithets that I talked about, but just because one is worse than the other doesn't mean that -- doesn't mean this one isn't seriously bad.

You yourself called it abhorrent.  I agree with you it's abhorrent.  I don't think it is the type of thing that is done accidentally.  I will tell you that I have to obviously go back and make a written order about why I think this was misbehavior,

why I think -- what exactly you did, why I think it was prejudicial and obstructive to the administration of justice. And I will go back and write that order, and if as I'm writing that order I change my mind, I will, of course, let you know. But for now I believe the appropriate penalty is a $2,500 fine, and so I will impose that.

Of course, none of this is effective until I issue a written order about it, but I just want to tell you where I am.

MR. SMITH:  Yes, Your Honor.

THE COURT:  Okay.  Having said that, Mr. Givens, any objection to anything I did or said or your opposing counsels did or said in that last session?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.

Yes, Heather?

THE COURTROOM DEPUTY:  I need the exhibits.

THE COURT:  That's good.  Let's get the exhibits.

MR. GIVENS:  I used a couple of them in close.  I just want to put them back in here, then we'll be ready to go.

THE COURTROOM DEPUTY:  I apologize.

THE COURT:  No, you should not apologize.

MR. GIVENS:  Heather was very diligent.

THE COURT:  Heather is always very diligent about this.  I'm not surprised at all.

Given that we are sort of now putting exhibits back in that we took out, please make sure everybody looks at the exhibit binder and is comfortable with it going back.

Everybody has taken a look and agreed at the exhibits that are going back?  Mr. Givens?

MR. GIVENS:  Yes, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  Yes, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  Yes.

THE COURT:  Mr. Smith?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Okay.  Heather, you can take all of that back.  When I say "all of that," I include the exhibits and the three copies or four copies of the instructions packet and also the verdict forms.

THE COURTROOM DEPUTY:  Yes, sir.

THE COURT:  One copy of the verdict forms.

Anything else before we take a little bit of a break and wait for the jury to come back?

Mr. Givens?

MR. GIVENS:  No.  Your Honor.  I assume Ms. Clark has our cell phones, our cell phone numbers, and we can be back --

THE COURT:  I would ask you all to stay very, very close.  I don't know exactly what is going to happen.  My general experience is that either there is a decision or a question within about an hour, or it will take somewhere on the order of three to four hours.

So I would ask you perhaps for the first 30 minutes or so, maybe 45 minutes, to really remain close.  You don't have to be in the courtroom but, whether it's upstairs or around, to really remain close.  Then after that, so long as Heather has your cell phone and a way of immediately contacting you and immediately getting through to you, I am okay with you all going somewhere else with the stipulation that you must be able to be back here within ten or 15 minutes.  This is not one where you're like, oh, sorry, I had traffic.  I can't get back for 20 or 25 minutes.  This is, if that is going to be a problem, do not leave, okay?

MR. GIVENS:  Yes, Your Honor.

MR. SMITH:  Judge, before we depart, I advised the Court on Thursday, I have a quick appearance with Judge Melanie Martin, but I don't plan to go further than there.

THE COURT:  Wait.  Sorry.  When do you have an appearance and at what time?

MR. SMITH:  It's across the street with Judge Melanie Martin, but if something comes up, Judge, I have somebody to stand in for me.

THE COURT:  That's fine, except I need to know what time it is.  Here's why:  If I can't get in touch with you a specific time, I need to know why I can't get in touch with you.

MR. SMITH:  It was at 1:30.  I'm on the docket.  I just want to go check on my client.  I will come right back.

THE COURT:  So you are not arguing?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  Fine.

Very good.  In that case, we're in recess.

(A break was taken from 2:01 p.m. to 4:16 p.m.)

THE COURT:  Everybody sit.  Or I guess since we're going to invite the jury back in in a moment, you can stand. But I think we have verdicts, or I understand we have verdicts.

Before we invite the jury in, anything from you, Mr. Givens?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No, sir.

THE COURT:  Let's invite the jury in.

THE COURT SECURITY OFFICER:  Ladies and gentlemen, the jury.

(Jury enters.)

THE COURT:  Everybody be seated, please.

Who is the jury foreperson?

JUROR NUMBER 10:  I am, Your Honor.

THE COURT:  Has the jury reached a verdict on all three counts?

JUROR NUMBER 10:  Yes, we have.

THE COURT:  Is it unanimous on all three counts?

JUROR NUMBER 10:  Yes, it is.

THE COURT:  Including, if you got to them, the questions?

JUROR NUMBER 10:  Yes, Your Honor.

THE COURT:  Can you please pass the verdict forms to the Bailiff?

Okay.  Verdict Form No. 1, on the charge of conspiracy to distribute a mixture or substance containing a detectable amount of methamphetamine, as set forth in Count 1 of the indictment and as explained in Court's Closing Instruction No. 8, we, the Jury, unanimously find the Defendant, Bruce Smith, guilty.

The quantity of a mixture or substance containing a detectable amount of methamphetamine involved in the conspiracy as a result of his own conduct or the conduct of other

conspirators known or reasonably foreseeable to him was -- and there is a checkmark or an asterisk or an X next to 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.

It is signed -- is it [Juror No. 10]?

JUROR NUMBER 10:  Yes, Your Honor.

THE COURT:  [Juror No. 10], 2/9/2026.

Verdict Form No. 2, on the charge of conspiracy to distribute a mixture or substance containing a detectable amount of cocaine, as set forth in Count 2 of the indictment and as explained in Court's Closing No. 9, we, the Jury, unanimously find the Defendant, Kevin Langel, guilty.

In terms of Question No. 1, the quantity of a mixture or substance containing a detectable amount of cocaine involved in the conspiracy attributable to Mr. Langel as a result of his own conduct and the conduct of other conspirators known or reasonably foreseeable to him was -- then, again, there is a checkmark in A or an asterisk or an X, five kilograms or more of a mixture or substance containing a detectable amount of cocaine, signed [Juror No. 10], 2/9/26.

Verdict Form 3, on the charge of conspiracy to distribute a mixture or substance containing a detectable amount of cocaine as set forth in Count 2 of the indictment and as explained in Court's Closing Instruction No. 10, we, the Jury, unanimously find the Defendant, Larry Rogers, guilty.

Question 1, the quantity of a mixture or substance containing a detectable amount of cocaine involved in the conspiracy attributable to Mr. Rogers as a result of his own conduct and the conduct of other conspirators known or reasonably foreseeable to him was -- then there is a checkmark or X or asterisk in A, 500 grams or more of a mixture or substance containing a detectable amount of cocaine.  It is signed [Juror No. 10], 2/9/26.

[Juror No. 10], to the best of your recollection, did I read all those correctly?

JUROR NUMBER 10:  Yes, Your Honor.

THE COURT:  Does anybody want the jury polled?  Mr. Golden?

MR. GOLDEN:  I do, Your Honor.

THE COURT:  Okay.  In that case, we're going to poll the jury as to everybody.

Heather, would you do that, and let's break it out one by one.

THE COURTROOM DEPUTY:  Good afternoon.  When I say your juror number, if you could answer yes or no.

This is to Count 1 of the superseding indictment against Bruce McArthur Smith.  Juror No. 1, is that your true verdict?

JUROR NUMBER 1:  Yes.

THE COURTROOM DEPUTY:  Juror No. 2, is this your true verdict?

JUROR NUMBER 2:  Yes.

THE COURTROOM DEPUTY:  Juror No. 3, is this your true verdict?

JUROR NUMBER 3:  Yes.

THE COURTROOM DEPUTY:  Juror No. 4, is this your true verdict?

JUROR NUMBER 4:  Yes.

THE COURTROOM DEPUTY:  Juror No. 5, is this your true verdict?

JUROR NUMBER 5:  Yes.

THE COURTROOM DEPUTY:  Juror No. 6, is this your true verdict?

JUROR NUMBER 6:  Yes.

THE COURTROOM DEPUTY:  Juror No. 7, is this your true verdict?

JUROR NUMBER 7:  Yes.

THE COURTROOM DEPUTY:  Juror No. 8,  is this your true verdict?

JUROR NUMBER 8:  Yes.

THE COURTROOM DEPUTY:  Juror No. 9, is this your true verdict?

JUROR NUMBER 9:  Yes.

THE COURTROOM DEPUTY:  Juror No. 10, is this your true verdict?

JUROR NUMBER 10:  Yes.

THE COURTROOM DEPUTY:  Juror No. 11, is this your true verdict?

JUROR NUMBER 11:  Yes.

THE COURTROOM DEPUTY:  And, Juror No. 12, is this your true verdict?

JUROR NUMBER 12:  Yes.

THE COURTROOM DEPUTY:  As to Count 2 against Kevin Langel, Juror No. 1, is this your true verdict?

JUROR NUMBER 1:  Yes.

THE COURTROOM DEPUTY:  Juror No. 2, is this your true verdict?

JUROR NUMBER 2:  Yes.

THE COURTROOM DEPUTY:  Juror No. 3, is this your true verdict?

JUROR NUMBER 3:  Yes.

THE COURTROOM DEPUTY:  Juror No. 4, is this your true verdict?

JUROR NUMBER 4:  Yes.

THE COURTROOM DEPUTY:  Juror No. 5, is this your true verdict?

JUROR NUMBER 5:  Yes.

THE COURTROOM DEPUTY:  Juror No. 6, is this your true verdict?

JUROR NUMBER 6:  Yes.

THE COURTROOM DEPUTY:  Juror No. 7, is this your true

verdict?

JUROR NUMBER 7:  Yes.

THE COURTROOM DEPUTY:  Juror No. 8, is this your true verdict?

JUROR NUMBER 8:  Yes.

THE COURTROOM DEPUTY:  Juror No. 9, is this your true verdict?

JUROR NUMBER 9:  Yes.

THE COURTROOM DEPUTY:  Juror No. 10, is this your true verdict?

JUROR NUMBER 10:  Yes.

THE COURTROOM DEPUTY:  Juror No. 11, is this your true verdict?

JUROR NUMBER 11:  Yes.

THE COURTROOM DEPUTY:  And, No. 12, is this your true verdict?

JUROR NUMBER 12:  Yes.

THE COURTROOM DEPUTY:  As to Count 2 of the superseding indictment as to --

THE COURT:  Count 3.

THE COURTROOM DEPUTY:  I'm sorry, Count 3.

THE COURT:  Actually, I guess you're right.  I'm sorry.  It is Count 2, but it's as to the different Defendant. Go ahead.  I got it wrong.  Go ahead.

THE COURTROOM DEPUTY:  As to Count 2 of the

superseding indictment as to Larry Rogers, Juror No. 1, is this your true verdict?

JUROR NUMBER 1:  Yes.

THE COURTROOM DEPUTY:  Juror No. 2, is this your true verdict?

JUROR NUMBER 2:  Yes.

THE COURTROOM DEPUTY:  Juror No. 3, is this your true verdict?

JUROR NUMBER 3:  Yes.

THE COURTROOM DEPUTY:  Juror No. 4, is this your true verdict?

JUROR NUMBER 4:  Yes.

THE COURTROOM DEPUTY:  Juror No. 5, is this your true verdict?

JUROR NUMBER 5:  Yes.

THE COURTROOM DEPUTY:  Juror No. 6, is this your true verdict?

JUROR NUMBER 6:  Yes.

THE COURTROOM DEPUTY:  Juror No. 7, is this your true verdict?

JUROR NUMBER 7:  Yes.

THE COURTROOM DEPUTY:  Juror No. 8, is this your true verdict?

JUROR NUMBER 8:  Yes.

THE COURTROOM DEPUTY:  Juror No. 9, is this your true

verdict?

JUROR NUMBER 9:  Yes.

THE COURTROOM DEPUTY:  Juror No. 10, is this your true verdict?

JUROR NUMBER 10:  Yes.

THE COURTROOM DEPUTY:  Juror No. 11, is this your true verdict?

JUROR NUMBER 11:  Yes.

THE COURTROOM DEPUTY:  Juror No. 12, is this your true verdict?

JUROR NUMBER 12:  Yes.

THE COURTROOM DEPUTY:  Judge, your jurors have been polled.

THE COURT:  Thank you, Heather.

Jury, thank you very much for all of the hard work you have put into this.  Part of my job as a judge is to make sure you all are paying attention.  Every time I looked, you all were paying attention and taking copious notes.  I appreciate it very much.

Here is where we go from here:  In a couple of moments, I am going to excuse you.  Once I excuse you, you can all make your way back into the jury room, and then each of you can do one of two things.  One is, you can wait for me and my clerks to come and say thank you in person and talk to you a little bit about the case, not about the substance of the case but just

about procedural things and what you think we can do better, my clerks always have interesting questions because they're about to be lawyers, and so they would love to hear from you on things like that.  We can't talk substance about the case.

I know we have been here for a very long time.  You all have put in a lot of time and effort, and I appreciate that.  I will not have any hard feelings if you all skedaddle right away.  If you want to stay, fine.  If a couple of you want to stay, fine.  Otherwise, feel free to go with our thanks.

Number 2, you at this point can talk to anybody about the case that you would like with one exception.  It is my policy that jurors do not talk to the lawyers in the case until the time for posttrial motions has run.  Once the time for posttrial motions has run, which you don't know when the time period is but you don't need to, once that time has run, if the lawyers would like to talk to you, the process is that they will contact my chambers, and I will send you all a letter with their information.  And if you want to talk to them, you can call them or e-mail them and talk to them.  If you do not want to talk to them, they cannot talk to you, so it will be your choice once you get communication from me, if they decide they want to talk to you.  Other than that, though, you're under no restrictions at all, and you can talk to whoever you want about the case.

Third and finally, let me thank you one more time.  This has been a long time.  I know you have all put in a lot of work.

I appreciate it very, very much.

With that, I will excuse you.  And if you want to wait around, we have five minutes of business to do, or ten minutes maybe.  If you want to wait around, I will see you all in a little bit.  Alternates, you can go with them.

(Jury exits.)

THE COURT:  Everybody be seated.  In that last session, was there anything I did or said or your opposing counsel did or said that you need to object to?

Mr. Givens?

MR. GIVENS:  No, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No.

THE COURT:  Mr. Smith?

MR. SMITH:  No, sir.

THE COURT:  Okay.  So, obviously, based on the jurors' verdicts, Bruce Smith is found and judged guilty of Count 1, and Mr. Langel and Mr. Rogers are found and judged guilty of Count 2.

I imagine we need to talk about detention at this point. Mr. Givens, do I understand correctly that we're under what I technically, with a lot of legal jargon, call the super-duper mandatory detention provision?

MR. GIVENS:  We are, Your Honor.  Based on the mandatory minimum sentences, there is a mandatory provision for detention.

THE COURT:  I'm happy, Mr. Golden, Mr. Tarver, or Mr. Smith, to listen to you all if you have one to be made about why despite the sort of highly mandatory nature of the statute at issue, I should not take your client into custody.

Mr. Golden, do you have anything?

MR. GOLDEN:  Your Honor, the circumstances that would give the Court at least some consideration to allow Mr. Smith to stay out is he has a minor child, who is a teenager, but a minor child that lives with him in North Dakota that he takes care of. Obviously, I guess we're -- February, so the child would be in school until at least June, late May, early June.  And, of course, it may be that time until we get to a sentencing phase. So he would like to be able to be there and take care of his child, not have to go somewhere else.

THE COURT:  What happens in June?  I mean, where is the child?  The child is going to have to go somewhere at some point.

MR. GOLDEN:  Sure.  At that point, without having to remove the kid from school, he can start making arrangements to go somewhere else.  That's why I said that.  Instead of removing the kid from their school and putting them in a different school, that allows them to transition after the school year.

THE COURT:  I understand your position.

Mr. Tarver.

MR. TARVER:  Your Honor, on behalf of Mr. Rogers, he has, as the Court has inquired about, a lot of medical issues, even on the -- in the Government's proof, he was back and forth to doctor's visits.  He's on a bunch of medications that he needs to be on to maintain his health or attempt to maintain his health.  My fear is that if he goes into custody at any of the local jails that the Marshals use, that they will not maintain his medical regimen that is a requirement to maintain his health.

THE COURT:  Can you just remind me, are we talking about sort of life-threatening issues or are we talking about -- I just forget.  Are we talking about sort of just it would be better if he stayed on his meds?

MR. TARVER:  He's indicating he's on heart medication, medication for being diabetic, and he also suffers from posttraumatic stress disorder from --

THE COURT:  Okay.

Mr. Smith?

MR. SMITH:  Yes, Your Honor.  My client, as the Court is aware from the evidence that came in, he and his wife own a business which is a salvage yard.  It has -- while they are older vehicles and items inventoried, that does have significant value to his wife, value that she needs.  He's the primary

person that protects and looks over that asset, and his immediate detention would make it such that a lot of that would just walk away.  So we would ask that the Court use its discretion to allow him to remain free on bond pending sentencing to wind down the business and to liquidate.

THE COURT:  Mr. Givens, anything you want to say about this?

MR. GIVENS:  Your Honor, I will just submit on behalf -- there is very narrow parameters with which the Court has discretion, and I would argue there is no discretion under the strict reading of the statute.  I don't believe these reasons proffered would give the Court that discretion to make -- ignore the mandatory nature that Congress has set for the statute.

THE COURT:  So as I understand the statute we're operating under, Mr. Givens is right.  Unless the Government is telling me for some reason they're going to seek probation, and I understand in this situation they're not telling me that, you know, the statute is all but 100 percent mandatory.  I guess some judges in this district read there to be a different statute that, if you read the two statutes together, you can find potentially an exception to keep somebody out on supervised release or, you know, on some sort of release pending -- I guess I should call it pretrial release pending sentencing for extraordinary circumstances.

Lorie E. Kennedy, RMR, CRR, CRC, United States Court Reporter
lorie_kennedy@ared.uscourts.gov (501)604-5165

I'm not sure that's the right read of the statute, but even assuming that was the right read of the statute and I had discretion for it, I think what the Eighth Circuit considers to be extraordinary circumstances are very, very, very narrow and intentionally so since, for the most part, this is a truly mandatory detention statute.  And I do not think that any of the Defendants have suggested to me anything that falls within that very narrow band of extraordinary circumstances in the way that the Eighth Circuit has set it out.  So I am going to order that each of the Defendants be remanded into custody.

Mr. Givens, anything else we need to tend to?

MR. GIVENS:  Not from the United States, Your Honor.

THE COURT:  Mr. Golden?

MR. GOLDEN:  No, Your Honor.

THE COURT:  Mr. Tarver?

MR. TARVER:  No.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  We are adjourned.

(Proceedings adjourned at 4:30 p.m.)


REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Lorie E. Kennedy, RMR, CRR, CRC
United States Court Reporter        Date: 9th of March, 2026